UNITED STATES of America,
Plaintiff,

v.

James Joseph WILSON, Defendant.

No. 2:03–CR–00882–PGC.

United States District Court,
D. Utah,
Central Division.

Jan. 13, 2005.

Barbara Bearnson, Esq., U.S. Attorney's Office, Salt Lake City, UT, for Plaintiff.

Mark S. Kouris, Esq., Utah Federal Defender Office, Scott C. Williams, Salt Lake City, UT, for Defendant.

## MEMORANDUM ORDER AND OPINION GIVING GREAT WEIGHT TO THE SENTENCING GUIDELINES IN DETERMINING APPROPRIATE SENTENCES

CASSELL, District Judge.

## I. INTRODUCTION

Yesterday the Supreme Court handed down its decision in *United States v. Book-*

er,[1] finding certain provisions of the Federal Sentencing Guidelines, promulgated pursuant to the Sentencing Reform Act of 1984,[2] unconstitutional. The Court first held that the Guidelines violated the defendant's Sixth Amendment right to a jury trial because they require judges to find facts which in turn increase a defendant's sentence beyond what could be imposed based solely on the jury's verdict. In the second part of the decision, the Court considered whether the unconstitutional portions of the Guidelines could be severed and the rest of the statutory scheme preserved. The Court held that by severing the two provisions in the Act that make the Guidelines mandatory, the rest of the sentencing scheme could be preserved. Specifically, the Court held that 18 U.S.C. § 3553(b)(1), and 18 U.S.C. § 3742(e), were "incompatible with today's constitutional holding."[3] The former provision stated that courts "*shall* impose a sentence . . . within the range" established by the Guidelines.[4] The latter provision mandated a *de novo* standard of review—a standard which, according to the Court, "depends upon the Guidelines' mandatory nature."[5] "So modified," the Court continued, "the Federal Sentencing Act . . . makes the Guidelines effectively advisory."[6]

In light of the Supreme Court's holding, this court must now consider just how "advisory" the Guidelines are. The court has before it for sentencing defendant James Joseph Wilson, who has pled guilty

---

1. *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, —— L.Ed.2d ——, 2005 WL 50108 (2005).

2. 18 U.S.C. § 3551 *et seq.*

3. *Booker*, —— U.S. at ——, 125 S.Ct. at 757, 2005 WL 50108, at *16.

4. 18 U.S.C. § 3551(b)(3) (emphasis added).

5. *Booker*, —— U.S. at ——, 125 S.Ct. at 757, 2005 WL 50108, at *16.

6. *Id.*

to armed bank robbery. In view of his lengthy criminal record and his brandishing of a sawed-off shotgun at several tellers, the Guidelines advise a prison sentence of no less than 188 months. What weight should the court give to this recommended sentence? This issue of the weight to be given to the advisory Guidelines will, of course, recur in all of the court's sentencings unless and until Congress responds to *Booker*.

Having reviewed the applicable congressional mandates in the Sentencing Reform Act, the court concludes that considerable weight should be given to the Guidelines in determining what sentence to impose. The Sentencing Reform Act requires the court to impose sentences that "reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, [and] protect the public." [7] The court must also craft a sentence that "afford[s] adequate deterrence to criminal conduct" and "protect[s] the public from further crimes of the defendant." [8] Finally, the court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." [9]

Over the last 16 years, the Sentencing Commission has promulgated and honed the Guidelines to achieve these congressional purposes. Congress, too, has approved the Guidelines and indicated its view that Guidelines sentences achieve its purposes. Indeed, with respect to the congressionally-mandated goal of achieving uniformity, the Guidelines are the *only* way to create consistent sentencing as they are the only uniform standard available to guide the hundreds of district judges around the country. Therefore, in all future sentencings, the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons. In this particular case, the court will follow the Guidelines and give Wilson a sentence of 188 months.

## II. THE GUIDELINES ARE "ADVISORY" IN THE WAKE OF BOOKER.

Yesterday's decision in *Booker* breaks down into two parts. The Court first determined that the Guidelines were unconstitutional because they required judicial fact-finding inconsistent with the Sixth Amendment. This court and a number of others anticipated that outcome six months ago.[10] More unexpected was the Court's decision as to the remedy for that constitutional defect. The Court held that, with the exception of two provisions severed from the federal sentencing statutes, the rest of the system remains in place. As *Booker* explained, Congress would have wanted "to maintain *all* provisions of the [Sentencing Reform] Act and engraft today's constitutional requirement onto that statutory scheme." [11] Thus, the Court severed a provision rendering the Guidelines mandatory—18 U.S.C. § 3553(b)—but left

7. *Booker,* —— U.S. at ——, 125 S.Ct. at 764, 2005 WL 50108, at *24.

8. 18 U.S.C. § 3553(a)(2)(B) & (C).

9. 18 U.S.C. § 3553(a)(6).

10. *See, e.g., United States v. Croxford,* 324 F.Supp.2d 1230 (D.Utah 2004); *United States*

*v. Schaefer,* 384 F.3d 326, 330 (7th Cir.2004); *United States v. Mueffleman,* 327 F.Supp.2d 79 (D.Mass.2004); *United States v. Medas,* 323 F.Supp.2d 436 (E.D.N.Y.2004); *United States v. Shamblin,* 323 F.Supp.2d 757 (S.D.W.Va. 2004).

11. *Booker,* —— U.S. at ——, 125 S.Ct. at 767, 2005 WL 50108, at *27 (emphasis added).

in place the adjoining provision— § 3553(a). Section 3553(a) lists the general purposes of sentencing and directs that the sentencing courts "shall consider" certain factors when imposing sentence. Among the factors listed are "the kinds of sentence and the sentencing range established" by the Guidelines.[12] This provision, according to *Booker*, "*requires* a sentencing court to *consider* Guidelines ranges ... but it permits the court to tailor the sentence in light of other statutory concerns as well." [13] *Booker* also directs courts to abide by the other provisions of the Sentencing Reform Act:

> Without the "mandatory" provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals .... The Act ... requires judges to consider the Guidelines sentencing range established for ... the applicable category of offense committed by the applicable category of defendant, the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. And the Act ... requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care.[14]

*Booker* finally held that "the Act continues to provide for appeals from sentencing decisions." [15] This means that sentences imposed by district courts must be reason-able given the factors set forth in the Act. One of those factors is the recommended Guidelines sentence. Specifically, "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing [one of them being the applicable Guidelines range]. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." [16]

In sum, *Booker* held that while the Guidelines are no longer mandatory, the rest of the Sentencing Reform Act is. And the remaining provisions of the Act require the court to consider the Guidelines as one factor in crafting a "reasonable" sentence.

## III. THE COURT SHOULD CONTINUE TO GIVE CONSIDERABLE WEIGHT TO THE SENTENCING GUIDELINES.

To comply with *Booker*, this court must now determine how to consider the Guidelines in determining the appropriate a sentence. As *Booker* held, "the district courts, while not bound to apply the Guidelines, *must consult those Guidelines and take them into account when sentencing*." [17] The critical question then becomes how much weight should the Guidelines carry in crafting a sentence.

In his dissent in *Booker*, Justice Scalia stated that "logic compels the conclusion that the sentencing judge, after considering the recited factors (including the Guidelines) has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the

---

**12.** 18 U.S.C. § 3553(a)(4).

**13.** *Booker*, —— U.S. at ——, 125 S.Ct. at 757, 2005 WL 50108, at *16 (emphasis added).

**14.** *Id.* at —— U.S. at ——, 125 S.Ct. at 764, 2005 WL 50108, *24 (internal quotations omitted).

**15.** *Id.*

**16.** *Id.*

**17.** *Booker*, —— U.S. at ——, 125 S.Ct. at 767, 2005 WL 50108, at *27 (emphasis added).

statutory range." [18] As a general statement of a sentencing judge's legal authority, Justice Scalia's description appears accurate. The wise exercise of that discretionary authority, however, requires a judge to consider how the legal and factual background has changed since the Act was passed. When imposing a sentence today, a district judge has clear congressional directives that a sentence must achieve. Accordingly, the court's discretion is limited to imposing a sentence that satisfies these congressional mandates. In all but the most unusual cases, the appropriate sentence will be the Guidelines sentence.

### A. The Court Must Impose a Sentence that Achieves the Congressionally–Mandated Purposes of Sentencing.

■ In imposing sentence, the court is of course circumscribed by any statutory maximum or minimum sentence. In this case, for example, defendant Wilson has pled guilty to armed bank robbery.[19] The statutory maximum for this offense is twenty-five years in prison; there is no mandatory minimum sentence, so the lowest possible sentence is probation, without prison time. The court's discretion must operate within these statutory boundaries.

This discretion, however, must also be exercised so as to comply with additional congressional mandates. Even as modified by *Booker*, the Sentencing Reform Act continues to direct that "[t]he court *shall* impose a sentence sufficient, but not greater than necessary, *to comply with the purposes set forth*" in the Sentencing Reform Act.[20] Those purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .[21]

In light of the congressional command that the court "shall" impose a sentence that is sufficient "to comply with the[se] purposes," the court must impose a sentence that achieves, for example, "just punishment" for an offense and which "afford[s] adequate deterrence to criminal conduct."

### B. Guidelines Sentences Generally Achieve the Congressionally–Mandated Purposes of Punishment.

To determine what particular sentence achieves such things as "just punishment" and "adequate deterrence," the court has information that was not available before the passage of the Sentencing Reform Act—specifically, the Sentencing Guidelines. When it passed the Sentencing Reform Act, Congress created the Sentencing Commission. The Commission is an expert agency specifically designed to assist the courts in imposing sentences that achieve the purposes of punishment. Congress gave the Commission significant staff and broad fact-finding powers.[22] In 1987, the Commission promulgated the first comprehensive set of Guidelines. For more than fifteen years, the Commission

---

18. *Booker*, —— U.S. at ——, 125 S.Ct. at 789, 2005 WL 50108, at *47 (Scalia, J. dissenting).

19. 18 U.S.C. § 2113(a) & (d).

20. 18 U.S.C. § 3553(a) (emphases added).

21. 18 U.S.C. § 3553(a)(2).

22. *See* 28 U.S.C. § 991.

has refined the Guidelines so that they achieve the congressionally-mandated purposes. This process is on-going. As *Booker* reminds us, "[t]he Sentencing Commission will continue to collect and study [trial court] and appellate court decisionmaking. It will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices."[23]

Congress has also had an opportunity to review both the initial Guidelines and all subsequent amendments to insure that they fulfill congressional purposes.[24] With regard to various crimes, Congress has adopted "sense of the Congress" resolutions, encouraging and even requiring that the Commission make various amendments to the Guidelines.[25] For some crimes, Congress even directly amended the Guidelines to provide what it believes is appropriate punishment to achieve its objectives.[26] The result is a congressionally-approved Guidelines system. As Senators Hatch, Kennedy, and Feinstein explained in their *amicus* brief in *Booker*:

> The 1984 Act represents the most comprehensive effort ever undertaken by Congress to reform the federal sentencing system. It is the product of more

than a decade of inter-branch and bipartisan legislative efforts in both Houses of Congress .... Since 1984, Congress has continued to monitor this area of law and has made revisions to the sentencing guidelines system through amendments to the 1984 Act and other legislation[27]

Congress' creation of the Commission and subsequent approval of the Commission's Guidelines provide strong reason for believing that Guidelines sentences satisfy the congressionally-mandated purposes of punishment. It would be startling to discover that while Congress had created an expert agency, approved the agency's members, directed the agency to promulgate Guidelines, allowed those Guidelines to go into effect, and adjusted those Guidelines over a period of fifteen years, that the resulting Guidelines did not well serve the underlying congressional purposes. The more likely conclusion is that the Guidelines reflect precisely what Congress believes is the punishment that will achieve its purposes in passing criminal statutes.

Congress has reconfirmed that its expectations that courts follow the Guidelines in the recently-adopted "Feeney Amend-

---

**23.** *Booker*, —— U.S. at ——, 125 S.Ct. at 766, 2005 WL 50108, at *26.

**24.** 28 U.S.C. § 994(p).

**25.** *See, e.g.*, PUB. L. 107–273, Div. C, Title I, § 11009(d), Nov. 2, 2002, 116 Stat. 1819 (sense of the Congress that a two-level enhancement should be required where the defendant used body armor); PUB. L. 107–56, Title VIII, § 814(f), Oct. 26, 2001, 115 Stat. 384 (directing Commission to amend Guidelines on computer fraud); PUB. L. 106–310, Div. B, Title XXXVI, § 3651, Oct. 17, 2000, 1143 Stat. 1238 (directing Commission to increase penalties for distributing ephedrine); PUB. L. 105–172, § 2(e), Apr. 24, 1998, 112 Stat. 55 (directing Commission to increase penalties for cloning wireless telephones);

PUB. L. 104–237, Title II, § 301, Oct. 3, 1996, 110 Stat. 3102 (directing Commission to amend the Guidelines to increase penalties for distributing methamphetamine; PUB. L. 103–322, Title IV, § 40112, Sept. 13 1994, 108 Stat.1903) (directing Commission to review disparities between sentences for various sex offenses); PUB. L. 100–690, Title VI, § 6482(c), Nov. 18, 1988, 102 Stat. 4382 (directing Commission to increase penalties for operation of common carrier under the influence of alcohol).

**26.** PUB. L. 108–21, Title IV, § 401(j) Apr. 30, 2003, 117 Stat. 673 (changing departure standards for child sex offenses).

**27.** *Brief of Amici Curiae, United States v. Booker* at 2, 4.

ment." [28] In 2003, Congress passed the Feeney Amendment to the Act, which was designed to address what is called "the serious problem of downward departures from the Federal Sentencing Guidelines by judges across the country." [29] The Feeney Amendment was meant to "put strict limitations on departures by allowing sentences outside the guidelines range only upon grounds specifically enumerated in the guidelines as proper for departure. This would eliminate ad hoc departures based on vague grounds, such as 'general mitigating circumstances.'" [30]

Among the Feeney Amendment's provisions was one requiring district courts to state in writing their reasons for departing from the sentencing guidelines:

> The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence-
>
> ... is outside the [Guideline] range ... the specific reason for the imposition of a sentence different from that described, *which reasons must also be stated with specificity in the written order of judgment and commitment* .... [31]

This provision, like all other provisions in the Feeney Amendment, remains in effect after *Booker.* Accordingly, it serves as a congressional reminder to the district courts that the Guidelines are to receive significant weight, and that if departure occurs, the court must provide a *written* explanation that will be closely examined on appellate review.

For all these reasons, the congressional intent underlying the Sentencing Reform Act, as modified by the Feeney Amendment, will generally be best implemented by a Guidelines sentence.

### C.  The Guidelines Generally Achieve "Just Punishment."

Even apart from congressional approval of the Guidelines, considerable evidence suggests that Guidelines sentences serve the congressionally-mandated purposes of punishment. [32]  Congress' first-identified purpose of punishment is for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense." [33]  The Guidelines well serve this fundamental purpose of sentencing.

Just punishment means, in essence, that the punishment must fit the crime.  In the Senate Report accompanying the Sentencing Reform Act, the Act's sponsors explained:

> [Just punishment]—essentially the "just deserts" concept—should be reflected clearly in all sentences;  it is another way of saying that the sentence should reflect the gravity of the defendant's conduct.  From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing recurrence of the offense.  From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not

---

**28.**  *See generally United States v. Van Leer,* 270 F.Supp.2d 1318 (D.Utah 2003).

**29.**  149 Cong. Rec. H3061 (Mar. 27, 2003) (statement of Rep. Feeney).

**30.**  *Id.*

**31.**  18 U.S.C. § 3553(c) (emphasis added).

**32.**  *See generally,* Paul G. Cassell, *Too Severe?: A Defense of the Federal Sentencing Guidelines (and a Critique of Federal Mandatory Minimums),* Stan L. Rev. 1017 (2004).

**33.**  18 U.S.C. § 3553(a).

differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.[34]

The concept of "just punishment" requires the court to consider society's views as to appropriate penalties, not just a judge's own personal instincts. As the Senate Report noted, the court should consider "the public's standpoint" in developing an appropriate sentence. Moreover, Congress expected that the Sentencing Reform Act would generally produce sentences that did "not differ substantially" between similarly-situated offenders. If "just punishment" meant nothing more than what a single judge thought was just punishment, then such uniformity of penalties would be impossible.

In determining society's views as to the appropriateness of federal sentences, we are fortunate to have very concrete data. In their informative book *Just Punishments: Federal Guidelines and Public Views Compared*, Professors Peter Rossi and Richard Berk systematically compare Guidelines sentences with sentences that the public would impose. By means of national public opinion survey, they studied 89 separate crimes, ranging in seriousness from illegal drug possession to kidnaping, including many of the crimes most frequently prosecuted in federal court.

Professors Rossi and Berk found considerable convergence between Guidelines sentences and the public's view of appropriate sentences. To provide a few illustrations:

- The Guidelines call for 39.2 years in prison for kidnaping when a victim is killed; the public believes 39.2 years is appropriate.

- The Guidelines call for 9.1 years in prison for trafficking in cocaine; the public believes 10 years is appropriate.

- The Guidelines call for 4.8 years in prison for bank robbery without a weapon; the public believes 4 years is appropriate.

- The Guidelines call for 2.5 years for a firearms dealer keeping poor sales records; the public believes 3 years is appropriate.[35]

From their data, Professors Rossi and Berk concluded that the Guidelines generally track public opinion:

[T]here is a fair amount of agreement between sentences prescribed in the guidelines and those desired by the members of the sample. The agreement is quite close between the means and the medians of respondents' sentences and the guidelines prescribed sentences. There is also quite close agreement between how individual respondents rank crimes and the way in which the guidelines rank the same crimes.

.    .    .    .    .

We interpret this major finding to mean that the ideas about sentencing in the guidelines and the interviews with respondents reflect societal norms concerning publishment for those who violate the criminal laws. Both the [sentencing] commission and the public converge on roughly the same sentences, because the commission sought to write guidelines that would be acceptable to major constituencies.... [T]he commission relied heavily on the central tendencies in past sentencing practices in federal courts as a kind of template for its sentencing rules, a

---

34. S. Rep. 98–225, 1984 U.S.C.C.A.N. 3182, 3258–59.

35. *Id.* at 92–93, tbl. 5.5 (comparing Guidelines sentence with median sentence from sample).

strategy that used those practices as a proxy for public preferences. Using this template, the commission avoided both overly lenient and overly harsh sentences and wrote sentencing rules that came close to the mainstream consensus.[36]

It is important to note a few areas of disagreement between the public's views and Guidelines sentences. The public failed to support the Guidelines' differentially harsh treatment of distribution of crack cocaine (as compared to powder cocaine); nor did it support the tough sentences for environmental crimes, violations of civil rights, and certain bribery and extortion crimes.[37] On the other hand, the public supported somewhat longer sentences for marijuana trafficking and for crimes endangering the physical safety of victims and bystanders (e.g., adding poison to over-the-counter drugs).[38] But these disagreements were the exceptions; the rule was that public opinion tracked Guidelines sentences.

Apart from the details of this public opinion polling, it is hardly surprising to find that the Guidelines track public views on appropriate punishment. The Guidelines were, after all, created through a democratic process. The public's elected representatives—Congress—created the Commission, approved the Guidelines, and then adjusted them over the years in an on-going dialog with the Commission. In light of these facts, it should be generally presumed that the Guidelines reflect the public's views on appropriate punishment.

This general convergence between public opinion and Guidelines sentences creates a strong reason for generally following Guidelines. Because sentencing must "promote respect for the law" and "provide just punishment for the offense,"[39] sentences generally ought to track societal norms. After all, criminal sentencing is the way in which society expresses its views on the seriousness of criminal conduct. To be sure, it is possible that a case can be made for deviating downward (or upward) from public opinion. In the area of civil rights offenses, for example, a criminal sentence might well seek to lead, rather than follow, public opinion by specially protecting minority rights. But aside from such unusual circumstances, Guidelines sentences will generally create "just punishment" by reflecting the public's judgment about the seriousness of an offense.

### D. The Guidelines Generally Achieve Crime Control Purposes.

The court is also required to impose a sentence that serves crime control purposes—e.g., deterrent and incapacitative purposes. Congress has specifically directed that all sentences must "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."[40] Essentially, these provisions require the court to determine whether a particular sentence is a cost-effective means of preventing crime, either by deterring potential criminals (general deterrence) or incapacitating criminals who would otherwise have committed more crimes (specific deterrence or incapacitation).

It is difficult for an individual judge to make such determinations. Focusing on "adequate deterrence," for example, the

---

36. *Id.* at 208.

37. *Id.* at 99.

38. *Id.*

39. 18 U.S.C. § 3553(a)(2).

40. 18 U.S.C. § 3553(a)(2)(B) & (C).

court must assess the potential impact of its sentences on potential offenders. As a starting point, this might require the court to take judicial notice of the fact that crime rates are now at their lowest levels in thirty years. Violent crime victimization rates have dropped from 47.7 per 1,000 population in 1973 to 22.8 in 2002, an amazing 52% reduction.[41] In other words, Americans today are only half as likely to fall victim to violent crime as they were in 1973. That drop in the crime rate has coincided with an increase in the number of prisoners behind bars, including substantial increases in the number of federal prisoners. Statistics reveal that 2002 was not only the year of the lowest victimization rate in recent history, but also the year with the highest prison population. Is this purely a coincidence? Or a consequence?

One recently published study by a well-known social scientist concluded that a significant part of the decline in violent crime is attributable to increased incarceration. Professor Steven Levitt concluded that increases in the size of the prison population, along with increases in the number of police and a few other factors could fully explain the drop in crime in the 1990s.[42] His study is not the only one to point in this direction. An expanding body of literature suggests that incarceration of dangerous persons in recent years

has demonstrably reduced crime, through both incapacitative and deterrent effects.

Of particular interest in considering Guidelines sentences may be a recent study assessing the deterrent effect of state truth-in-sentencing laws.[43] Since 1994, Congress has provided some incentive grants to states who can demonstrate that violent offenders serve at least 85% of their sentences. Interestingly, these state truth-in-sentencing laws would track the Guidelines, which demand that prisoners serve 85% of their sentences. A sophisticated regression analysis comparing states with and without such truth-in-sentencing programs found that the laws decreased murders by 16%, aggravated assault by 12%, robberies by 24%, rapes by 12%, and larcenies by 3%. There was a "substitution" by offenders into less risky property crimes: burglaries increased by 20% and auto thefts by 15%. Overall, the net reductions in crime were substantial.

These studies focus on a deterrence effect from criminal penalties. Other studies confirm the obvious point that incarcerating an offender prevents him from repeating his crimes while he is in prison.[44]

More generally, estimates of both a deterrent and an incapacitative effect have suggested that each 1% increase in the prison population produces approximately

---

41. U.S. Dept. of Justice, Bureau of Justice Statistics, National Crime Victimization Survey, Violent Crime Trends, 1973–2002, *available at* www.ojp.usdoj.gov/bjs.

42. Steven D. Levitt, *Understanding Why Crime Fell in the 1990s: Four Factors That Expalin the Decline and Seven That Do Not*, 18 J. ECON. PERSPECTIVES 163 (2004).

43. Joanna M. Shepherd, *Police, Prosecutors, Criminals and Determinate Sentencing: The Truth about Truth–in–Sentencing Laws*, 45 J.L. & ECON. 509 (2002).

44. Peter W. Greenwood et al., *Three Strikes and You're Out: Estimated Benefits and Costs of California's New Mandatory–Sentencing Law, in* THREE STRIKES AND YOU'RE OUT: VENGEANCE AS PUBLIC POLICY 543 (David Schichor & Dale K. Sechrest eds.1996); Joanna M. Shepherd, *Fear of the First Strike: The Full Deterrent Effect of California's Two- and Three–Strikes Legislation*, 31 J. LEGAL STUD. 159 (2002).

0.10% to 0.30% fewer index crimes.[45] Renowned criminologist James Q. Wilson, for example, has opined that this "elasticity" of crime with respect to incarceration is between 0.10% and 0.20%.[46] Professors Thomas Marvell and Carlisle Moody have examined crime statistics and prison populations for 49 states over the period 1971–89.[47] They found that a 1% increase in prison population results in approximately 0.16% fewer reported index crimes. Professor Steven Levitt has found a higher elasticity—about 0.30% or more—in a recent sophisticated, comparative analysis of twelve states that experienced system-wide restraints on prison populations imposed by federal courts.

The point of recounting these statistics is not to suggest that the court will make a finding on the elasticity of crime with respect to incarceration before imposing a sentence—far from it. Instead, the point here is that the court is poorly suited to consider elasticities and other factors that would go into a sensible deterrence calculation. On the other hand, the Sentencing Commission with its ability to collect sentencing data, monitor crimes rates, and conduct statistical analyses, is perfectly situated to evaluate deterrence arguments.

Further problems abound for an individual court in considering deterrence issues. Congress has directed that a sentence provide "adequate" deterrence to future crimes. Presumably, determining adequacy requires some consideration of not only the number of crimes to be deterred, but also the harm stemming from those crimes. While a court may be well situated to determine the harms of the particular crime before it (through victim impact statements, police reports, and the like), it would be hard pressed to give more than an educated estimate of the general harms imposed by a class of crimes. On this point, the available data suggests that the costs are staggeringly high. One of the most comprehensive analyses was done by Ted R. Miller and his colleagues for the National Institute of Justice in 1996.[48] They evaluated only the costs of crime to crime victims, ignoring costs to the criminal justice system and other social costs associated with the fear of crime. They separated victims' costs into two parts: tangible and intangible losses. Using sophisticated methodology, Miller and his colleagues calculated a total loss per criminal victimization that ranged from $2.9 million for various forms of murder to $87,000 for rape and sexual assault to $8,000 for robbery to $1400 for burglary to $370 for larceny.[49] They also computed the aggregate annual victim cost in the United States from crime—$450 billion as of 1990, or more than $1800 per U.S. resident.[50] Another more recent analysis using a different methodology reported an even higher aggregate burden from crime on the United States—in the neighborhood of $1 trillion annually.[51]

**45.** Here I draw on the helpful analysis of the studies found in John J. Donohue III & Peter Siegelman, *Allocating Resources Among Prisons and Social Programs in the Battle Against Crime*, 27 J. LEGAL STUD. 1, 12–14 (1998).

**46.** James Q. Wilson, *Prisons in a Free Society*, 117 PUB. INTEREST 37, 38 (Fall 1994).

**47.** Thomas Marvell & Carlisle Moody, *Prison Population Growth and Crime Reduction*, 10 J. QUANTITATIVE CRIMINOL. 109 (1994).

**48.** U.S. DEPT. OF JUSTICE, NAT'L INST. OF JUSTICE, VICTIM COSTS AND CONSEQUENCES: A NEW LOOK (1996).

**49.** *Id.* at 9.

**50.** *Id.* at 17.

**51.** David A. Anderson, *The Aggregate Burden of Crime*, 42 J.L. & ECON. 611 (1999).

To be sure, one can dispute these figures. But the important point for present purposes is that determinations of the "adequacy" of a deterrent to, say, armed bank robbery (the crime at issue in this case) is difficult to make in an individual case. The Sentencing Commission, though, is well situated to evaluate such issues. As *Booker* explains, "the Sentencing Commission remains in place, writing Guidelines, collecting information about actual district court sentencing decisions, undertaking research, and revising the Guidelines accordingly." [52]

If there were any doubt about the Commission's fact-finding abilities on deterrence issues, it would be well to remember—once again—that Congress has approved the Guidelines. Congress has ample data gathering abilities of its own through hearings and other devices. The Supreme Court has recognized that Congress "may inform itself through factfinding procedures ... that are not available to the courts." [53] In light of the congressional sanctioning of the Guidelines, courts should be reluctant to offer judgments about crime control issues. Congress' judgment is entitled to considerable weight on this subject as well.

E.   Rehabilitation Does Not Justify a Shorter–Than–Guidelines Sentence.

The fourth purpose of punishment specified by Congress is "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner ...." [54] This purpose can be generally described as "rehabilitation." Some might argue that Guidelines sentences are contrary to rehabilitative efforts. But the Commission considered this goal in drafting the Guidelines. [55] More important, it seems clear that in cases such as this one—involving a lengthy prison sentence—rehabilitation is a subordinate consideration to just punishment and crime control. Congress itself directed the Commission to insure that the Guidelines "reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocation training, medical care, or other correctional treatment." [56] The Senate Report explained that the thinking behind this directive was to place rehabilitation as a secondary consideration where serious crimes were involved:

> It is understood, of course, that if the commission finds that the primary purpose of sentencing in a particular kind of case should be deterrence or incapacitation, and that a secondary purpose should be rehabilitation, the recommended guideline sentence should be imprisonment if that is determined to be the best means of assuring such deterrence or incapacitation, notwithstanding the fact that such a sentence would not be the best means of providing rehabilitation. [57]

Another reason for placing rehabilitation in a secondary position is that the court

**52.**   *Booker,* —— U.S. at ——, 125 S.Ct. at 767, 2005 WL 50108, at *27.

**53.**   *See e.g., Bush v. Lucas,* 462 U.S. 367, 389, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).

**54.**   18 U.S.C. § 3553(a)(2)(D).

**55.**   *See* U.S.S.G. § 1A1.1 (policy statement). *Cf.* Marc Miller, *Purposes at Sentencing,* 66 S. Cal. L. Rev. 413 (1992) (arguing that Commission should have delineated its analysis further).

**56.**   28 U.S.C. § 924(k).

**57.**   S. Rep. 98–225, 1984 U.S.C.A.N. 3182, 3259 n. 288.

has no way of determining whether a defendant has been rehabilitated. In this case, for example, the Guidelines call for a sentence of no less than 188 months. The court cannot determine today whether after completing, for example, 100 months of his sentence, defendant Wilson will have rehabilitated himself to the point where he is no longer a threat to society. Nor does any parole mechanism exist under the Sentencing Reform Act to make such a determination. The Sentencing Reform Act not only created the Guidelines but also abolished parole. The Senate Report accompanying the Sentencing Reforming Act suggested that a parole-based sentencing scheme had failed and had led to the many discrepancies between sentences: "[M]ost sentencing judges as well as the parole commission agree that the rehabilitation model is not an appropriate basis for sentencing decisions." [58]

After *Blakely*, some courts and commentators began to consider whether it would be appropriate for judges to revive the parole procedures.[59] For example, it could be argued that "if the [Sentencing Reform Act] is unconstitutional, parole is back." [60] *Booker*, however, never hints at a possible revival. To the contrary, it makes clear that the only unconstitutional provisions in the Act are two provisions regarding the binding nature of the Guidelines.[61] In light of *Booker's* silence it must be presumed that the Sentencing Reform Act's abolition of parole remains. Because parole is not a possibility for defendants such as Wilson, the court must follow the Guidelines' lead in giving rehabilitation a subsidiary role in determining the prison sentence.

F. The Limited Effect of the Parsimony Provision.

One possible reason for avoiding a Guidelines sentence might be the so-called "parsimony provision," which provides that "the court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes [of punishment] set forth in [the Sentencing Reform Act]." [62] It is possible to argue that this provision requires the courts to impose sentences below the Guidelines range, because Guidelines sentences are not parsimonious.[63] This is an interesting argument worthy of discussion.

Determining what the parsimony provision means is difficult. As Professors Marc Miller and Ronald Wright have noted, "[t]he full history and possible meanings of the parsimony provision, and of all of section 3553(a), have not yet been written." [64] While they trace the concept to Professor Norval Morris's 1974 book *The*

---

58. S. Rep. 98–225, 1984 U.S.C.A.N. 3182, 3224.

59. *See, e.g., Mueffelman,* 327 F.Supp.2d at 96 ("Plainly there is a problem with reinstituting an indeterminate system, when there is no longer parole.").

60. Ian Weinstein & Nathaniel Z. Marmur, *Federal Sentencing During the Interregnum: Defense Practice as the Blakely Dust Settles,* 17 FED. SENT. R. 51, 2004 WL 2566155, at *4 (Oct.2004).

61. *See Booker,* —— U.S. at ——, 125 S.Ct. at 757, 2005 WL 50108, at *16.

62. 18 U.S.C. 3553(a) (emphasis added).

63. *See* http://sentencing.typepad.com/sentencing_law_and_policy (Jan. 12, 2005) (The Power of Parsimony (and Justice Breyer's Notable Omission)) (Prof. Douglas Berman tentatively advancing this suggestion).

64. Marc L. Miller & Ronald F. Wright, *Your Cheatin' Heart(land): The Long Search for Administrative Sentencing Justice,* 2 BUFF. CRIM. L. REV 723, 810 n. 57 (1999).

*Future of Imprisonment,*[65] the concept seems to extend all the way to back to general notions of utilitarianism espoused by Jeremy Bentham.[66] With regard to the Sentencing Reform Act, the relevant legislative history shows that, much of the remaining Act originated not in the Senate but in the House (which desired a more flexible guidelines system)[67]

After reviewing this history, Professors Miller and Wright concede that the parsimony provision has played "almost no role in caselaw,"[68] but maintain that "the parsimony concept is powerful evidence ... that both the Senate and the House were attempting to pass a statute giving more substantial power to sentencing judges to impose a sentence outside the guidelines range."[69] This conclusion about legislative history seems debatable. But for present purposes, the critical issue is the meaning of the language congress ultimately enacted. It requires a court to impose a sentence *"sufficient,* but not greater than necessary, to comply" with purposes of Sentencing Reform Act.[70] The court must, therefore, first determine what is a "sufficient" sentence. For the reasons given above, the Guidelines ranges are designed to impose sufficient punishment and

appear to impose sufficient punishment in most cases.

Moreover, the Commission was itself bound by the parsimony provision.[71] While some have argued that the Commission gave insufficient attention to the provision,[72] the fact remains that the Commission promulgated guidelines that it viewed as parsimonious. If the Commission was mistaken and the ranges were not parsimonious, Congress could have simply rejected them. Congress, of course, did nothing of the sort. To the contrary, in the 15 years since adoption of the Guidelines, the general tenor of Congressional efforts has been to constantly prod the Guidelines upward.

There may be an argument that the parsimony provision generally requires a court to impose a sentence at the low end of any applicable Guidelines range. This is something that judges generally do today; the vast majority of judges sentence at or toward the very bottom of any applicable Guidelines range.[73] But the application of the parsimony provision to sentences *within* a Guidelines range need not be resolved in this case. The government is recommending that defendant Wilson be sentenced at the low end of the Guidelines

---

**65.** *See* Norval Morris, The Future of Imprisonment 60–62 (1974).

**66.** *See* Jeremy Bentham, Of the Influence of Time and Place in Matters of Legislation (1843) (presenting utilitarian theory of punishment that rests on the idea of no unnecessary punishment).

**67.** *See also,* H.R. Conf. Rep. 98–1159, 1984 U.S.C.C.A.N. 3710; H.R. Conf. Rep. 98–1159, 1984 U.S.C.C.A.N. 3710, 3711; *see generally,* Miller & Wright, *supra.,* 2 Buff. Crim. L. Rev. at 744.

**68.** *Id.; cf. United States v. Davern,* 970 F.2d 1490, 1498 (6th Cir. en banc)(finding parsimony provision of limited significance).

**69.** *Id.* at 746–47.

**70.** 18 U.S.C. § 3553(a) (emphasis added).

**71.** *See* 28 U.S.C. § 994(b)(1) (Guidelines shall comply with all "pertinent provisions" of Title 18.).

**72.** *See* Marc L. Miller, *Domination and Dissatisfaction: Prosecutors as Sentencers,* 56 Stan. L. Rev. 1211, 1269 n. 9 (2004).

**73.** *See* Frank O. Bowman, III, *Fear of Law: Thoughts on* Fear of Judging *and the State of the Federal Sentencing Guidelines,* 44 St. Louis L. Rev. 299, 338 (2000) (about 80% of all drug offenders sentenced at or below the Guidelines minimum and about an addition 10% sentenced in the lower half of the range).

range that applies to him. Because the court is inclined to follow that recommendation, it is enough to conclude that a low-end sentence within a Guidelines range is parsimonious, leaving for another day whether only a sentence at the low end of the range would be parsimonious.

G. The Guidelines Should Be Followed to Avoid Unwarranted Sentencing Disparity.

A final reason for giving heavy weight to the Guidelines to avoid unwarranted sentencing disparity. Avoiding unwarranted sentencing disparity was the main goal of the Sentencing Reform Act. The Guidelines were primarily formulated to "eliminate the unwarranted disparities that proliferated under the prior sentencing regime and to foreclose the consideration of race, gender, and other illegitimate factors at sentencing."[74] As *Booker* explains, Congress' "basic statutory goal in enacting the Guidelines was to provide a sentencing system that diminishes sentencing disparity"[75] and "to move the sentencing system" in the direction of increased uniformity."[76] In an effort to achieve this end, "Congress directed the [Sentencing] Commission ... to provide certainty and fairness in sentencing and avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted."[77]

While *Booker* renders the Guidelines advisory, the court is still obligated to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct ...."[78] The only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases. The only standard currently available is the Sentencing Guidelines. If each district judge follows his or her own views of "just punishment" and "adequate deterrence," the result will be a system in which prison terms will "depend on 'what the judge ate for breakfast' on the day of sentencing" and other irrelevant factors.[79] Such a result would be intolerable in a society committed to the rule of law and to equal treatment of offenders regardless of race, class, gender, or geographical location. It would, in short, be a return to the pre-Guidelines days, which "produced astounding disparities among the sentences that were imposed on defendants convicted of the same offense with similar backgrounds with different judicial districts across the country—and even among different judges in the same district."[80]

To be sure, reasonable minds may differ about whether the Guidelines are the best standard against which to measure the fairness of sentences. It is no secret that some judges believe sentences are too harsh, although the degree of judicial dis-

---

**74.** *Brief of Amici Curiae, United States v. Booker* at 3.

**75.** *Booker,* —— U.S. at ——, 125 S.Ct. at 759, 2005 WL 50108, at *19.

**76.** *Id.* at —— U.S. at ——, 125 S.Ct. at 760, 2005 WL 50108, *20.

**77.** *Brief of Amici Curiae, United States v. Booker* at 16 (internal citations omitted).

**78.** 18 U.S.C. § 3553(a)(6).

**79.** *Blakely v. Washington,* —— U.S. ——, ——, 124 S.Ct. 2531, 2533, 159 L.Ed.2d 403 (2004) (Breyer, J., dissenting). *See generally* Stephen Breyer, *The Federal Sentencing Guidelines and Key Compromises Upon Which They Rest,* 17 HOFSTRA L.REV. 1 (1988).

**80.** *Brief of Amici Curiae, United States v. Booker* at 4.

satisfaction with the Guidelines is easy to overstate.[81] The fundamental fact remains, however, that the Guidelines are the *only* standard available to all judges around the country today. For that reason alone, the Guidelines should be followed in all but the most exceptional cases.

■ For all these reasons, the court concludes that in exercising its discretion in imposing sentences, the court will give heavy weight to the recommended Guidelines sentence in determining what sentence is appropriate. The court, in the exercise of its discretion, will only deviate from those Guidelines in unusual cases for clearly identified and persuasive reasons. This is the only course that implements the congressionally-mandated purposes behind imposing criminal sentences.

## IV. Procedures to Be Followed in all Sentencings.

■ Having set out the substantive considerations that will govern sentences in this court, it is now appropriate to spell out the *procedures* for future sentencings. Because the court will continue to give considerable weight to the Guidelines in all of its sentencings, the court will continue to follow all procedural components of the Guidelines system. Obviously, the court cannot comply with *Booker's* mandate to "consider" the Guidelines sentence before imposing the final sentence[82] unless the Guidelines sentence is available. Accordingly, the probation office is directed to continue preparing pre-sentence reports that contain Guidelines calculations, including calculations based on the "real offense" involved with any offense of conviction. Prosecutors and defense attorneys are directed to continue to make objections to any deficiencies in the pre-sentence report, just as they have always done. The court, as it did before *Booker*, will resolve any disputes at the sentencing hearing.[83]

■ Careful preparation of a pre-sentence report and district court resolution of disputed facts is important for additional reasons as well. Under *Booker*, both the defendant and the government are authorized to appeal a sentence imposed as a result of an "incorrect application of the sentencing guideline."[84] This may seem a bit odd in view of *Booker's* determination that the Guidelines are only advisory.[85] But the obligation of a trial judge is to faithfully prepare an appropriate trial court record, leaving it to the appellate court judges to sort out the ultimate implications of that record.

■ One last point about the pre-sentence report and sentencing hearings is important. The Guidelines themselves contain provisions designed to provide necessary flexibility in unusual cases. The Guidelines provide for "departures" where "there exists an aggravating or mitigating circumstance ... of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating

---

81. *See* U.S. Sentencing Commission, Survey of Article III Judges on the Federal Sentencing Guidelines (March 2003) (finding that approximately 38.4% of responding district court judges reported that the Guidelines' attained a "higher achievement," 38.6% reported "middle achievement," and 22.9% reported "lower achievement").

82. *Booker*, —— U.S. at ——, 125 S.Ct. at 757, 2005 WL 50108, at * 16.

83. *See* Fed. R. Crim. P. 32.

84. 18 U.S.C. § 3742(a)(2) (appeal by defendant); 18 U.S.C. § 3742(b) (appeal by government).

85. *Cf. Booker*, —— U.S. at ——, 125 S.Ct. at 793, 2005 WL 50108, at *49 (Scalia, J., dissenting) (arguing that appeals under *Booker* are out of "Wonderland")

the Guidelines ...." [86] The Guidelines also provide for departures in specified unusual circumstances, such as when a defendant engages in extreme conduct [87] or suffers from diminished capacity. [88] Under these departure provisions, a sentence for an unusual case can comply with the Guidelines systems even though it is outside the Guidelines range. If a defendant (or the government) believes that a departure from the Guidelines range is appropriate, they should present that issue to the probation office for inclusion in the pre-sentence report. They should then be prepared to present their departure argument at the sentencing hearing.

▮ At the sentencing hearing, the court will resolve all disputes about application of the Guidelines, and then determine what the advisory Guidelines range is. The court will then give considerable weight to that recommended Guidelines sentence while exercising its discretion in determining the sentence. If the court decides to impose a sentence different than that advised by the Guidelines the court will explain with specificity in writing its reasons as required by the Feeney Amendment. [89]

### V. Determining Defendant Wilson's Sentence.

In light of these principles, the court is now in a position to determine defendant Wilson's sentence.

### A. Offense Conduct and Criminal History.

The court finds the following facts: defendant Wilson robbed three bank tellers at gunpoint. On October 30, 2003, at approximately 9:00 a.m., Wilson ran into the Intermountain Credit Union in Salt Lake City, Utah. He was wearing a hooded mask, a black fleece shirt, dark pants, and white cross-trainer style shoes. He was brandishing what appeared to be a sawed-off shotgun. Wilson leaped onto the teller counter then jumped down behind the counter demanding money. Three tellers were on duty, two behind the teller counter and a third was using a telephone. The defendant pointed his weapon at two of the tellers, demanding they open their money drawers. As they opened their drawers, he stuffed money into his pants pockets and continued to demand more money. After obtaining approximately $13,626, he fled the credit union in a late model 1980s gray or silver sedan. According to the victims, Wilson's hooded mask had unusually large holes for the mouth and eyes. Despite his wearing a mask, the tellers were able to provide detailed descriptions of the defendant's facial features. The tellers were able to approximate the defendant's height at 5 feet 7 inches, and his weight at approximately 160 pounds.

Two days later, Wilson was arrested by state authorities for Aggravated Assault after a physical altercation with his girlfriend. During this incident, Wilson allegedly held a sawed-off shotgun to his girlfriend's head as he threatened her. As a similar weapon was used in the robbery, Wilson became a suspect in the robbery. The tellers later identified Wilson as the robber. The police also developed compelling evidence of his guilt, including matching his shoeprints with those left on the teller counter. Police also learned that Wilson was a member of the Black Mafia Gangsters.

---

86. U.S.S.G. § 5K2.0

87. U.S.S.G. § 5K2.8.

88. U.S.S.G. § 5K2.13.

89. 18 U.S.C. § 3553(c).

Wilson ultimately pled guilty to armed bank robbery. The pre-sentence report revealed that Wilson is a five-time felony offender. In 1991, he pled guilty to raping a fourteen-year-old girl in Salt Lake City, Utah. In 1991, he also pled guilty in St. Louis, Missouri, to beating and robbing a victim. And also in 1991, he pled guilty to attempted sexual abuse of a twelve-year-old girl in the same court. While in prison on these charges, he received 78 disciplinary actions and 22 verbal warnings, as well as a misdemeanor conviction for smuggling illegal drugs into the Utah State Prison. After being paroled in 1996, in 1997 he pled guilty in Salt Lake City, Utah, to robbing a victim by simulating the presence of a firearm. Paroled after a year, he absconded from the supervision of the Department of Corrections in 2000, a misdemeanor offense to which he then pled guilty.

B. Victim Impact Statement.

The court has been made aware of the seriousness of the defendant's current offense through powerful victim impact statements from the three tellers. One of the impact statements will serve to illustrate the devastating consequences of violent crimes such as Wilson's:

Your Honor,

It is still so difficult for me to talk about this matter, so I appreciate your comprehension on my spell[ing] and construction of the phrases, because the English is not my main language.

When I came in from Mexico in 1999 to the United States with my husband, an American citizen, without my children and grandchildren, it was so hard for me. But my goal was to enjoy what this country could offer me and try to do something to help other[s] who may need my help and support, and mainly to help my husband and family in Mexico.

I started working and paying taxes, as the government laws, rules and policies are specified, and [to] be a good human being and American resident.

When the robbery happened, my life turned 180 degrees and confronted me with the violence of the big cities; I have tried so hard to leave this experience behind me so it would not affect my family, but it did. This part was extremely hurt[ful] for me. Not only the life of my sons, sisters and husband were shocked so badly, but could you imagine the reaction of my 10–year–old grandson, when he knew of the situation? His world is his family: grandparents, parents, aunts, uncles, cousins, etc., besides we have been very close to him. Having [told] him that his "Ita" (nickname for little grandmother) was exposed in an armed robbery was too much for him.

Obviously this affected my relationship with my family and the people around me, even though I have tried tenaciously, to not let it happen. I have not been totally successful. I could say sometimes I am still a little paranoid by observing and scrutinizing the customers in my job or the people around [me].

Even when the counseling services were offered to me by the FBI agents, I refused them because I consider myself a brave person, so I will be fighting with this feelings and fears and trying go ahead with my life, avoiding negative thoughts and [ ] trusting on the good faith of people. I do not know how long it will take me, but I am pretty sure I will get over it, because I have the guidance of the Lord and the love and support of my family.

Now I will be glad to tell my grandson that the justice always triumph[s] and the robber will pay for his actions and the most important: HE WON'T HURT

ANYMORE PEOPLE or FAMILIES AS HE DID WITH ME AND MY FAMILY.

. . . . .

If you give me the opportunity to ask you something: please do not leave this criminal to be free to hurt somebody else.

Kind regards.

[name redacted] [90]

## C. The Appropriate Prison Sentence for Defendant Wilson.

■ As the court understands the parties' positions, both sides agree that the Guidelines range is a level 31. This calculation is derived from a base offense level for robbery of 20,[91] increased by two levels for theft from a financial institution,[92] increased by five levels for brandishing a firearm,[93] and finally increased by one level for loss in excess of $10,000.[94] Wilson's offense level is then increased a further six levels because he is a career offender in light of his extensive criminal history.[95] From this total level of 34, three levels are subtracted for his acceptance of responsibility.[96] The probation office also calculated that Wilson is in criminal history category VI, the highest category. These calculations produce a sentencing range of 188–235 months in prison. The government is recommending the low end of this range—188 months—in light of Wilson's guilty plea. Wilson argues for a sentence substantially lower than 188 months.

For the reasons explained above, the court will, in exercising its discretion, give considerable weight to the recommended Guidelines sentence of no less than 188 months. Having considered all of the purposes of punishment—including the need to impose just punishment, to adequately deter future criminal violations, and to avoid unwarranted disparity in sentencing—the court concludes that the advisory Guidelines sentence is appropriate here. Therefore, the court will impose a sentence of 188 months.

The court acknowledges that there is a provision in Wilson's plea agreement that could be interpreted as barring him from taking advantage of the *Booker* ruling invalidating the Guidelines.[97] Enforcing that provision, however, might create additional litigation about its enforceability. The safest course seems to be to simply not apply that provision against Wilson, and proceed as outlined above.

## D. Restitution to the Victim Credit Union.

■ The court must also determine whether to order restitution. The presentence report recommends restitution to the credit union of $9,795.15, covering the net loss from the robbery. The court is obligated to award restitution in this amount under the Mandatory Victim Restitution Act (MVRA) because Wilson's crime is a crime of violence.[98] There remains the possibility, however, that *Booker*

**90.** Victim Impact Statement of Bank Teller, Attachment 2 to P.S.R. (punctuation edited for clarity).

**91.** U.S.S.G. § 2B3.1.

**92.** U.S.S.G. § 2B3.1(b)(1).

**93.** U.S.S.G. § 2B3.1(b)(2)(A).

**94.** U.S.S.G. § 2B3.1(b)(7)(B).

**95.** U.S.S.G. § 4B1.1.

**96.** U.S.S.G. § 3E1.1.

**97.** *See* Statement in Advance of Plea, ¶ 4 (attempted *Blakely* "waiver").

**98.** 18 U.S.C. § 3663A.

renders the MVRA unconstitutional. It could be argued that, like the Guidelines found invalid in *Booker*, the MVRA requires judicial fact-finding beyond that authorized by the Sixth Amendment.

However *Booker* is not directly controlling on the issue of the constitutionality of the MVRA. *Booker* focused on the Sentencing Reform Act of 1984, while the MVRA was enacted separately in 1996.[99] Moreover, *Booker* appears to address only the question of the constitutionality of the Guidelines. While the Guidelines contain their own restitution section,[100] that section is essentially a cross-reference to the statutory provisions of the MVRA. The question of whether the MVRA is constitutional, therefore, was not decided by *Booker*.

Nonetheless, this court has already decided that the Sixth Amendment does not apply to restitution awards under the MVRA. As explained in this court's decision in *United States v. Visinaiz*,[101] restitution is not a criminal penalty and therefore is not covered by the Sixth Amendment. This conclusion rests on the recognition that restitution is primarily designed to compensate, not punish. The Tenth Circuit has held, for example, that the purpose of restitution " 'is not to punish defendants or to provide a windfall for crime victims, but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.' "[102] Similarly, in *United States v. Newman*,[103] the Seventh Circuit emphasized that "[r]estitution has traditionally been viewed as an equitable device for restoring victims to the position they had occupied prior to a wrongdoer's actions."[104] And even the Supreme Court has noted that the ordinary meaning of restitution is to "restor[e] someone to a position he occupied before a particular event."[105]

As explained in *Visinaiz*,

[t]he notion of compensating victims for losses attributable to the defendant's crime is logically and intuitively non-punitive. For example, if a burglar is caught running out of a house with the homeowner's television, we would not say he was "punished" if the police officer took the television and gave it back to its owner. If a bank robber is caught on the bank's front steps, we would not say it is a "penalty" to give the loot bag back to the tellers. Requiring return of the property instead works to prevent a criminal from receiving a windfall by forcing him to disgorge an unjustly obtained benefit. Variations on these fact patterns are simply matters of degree. Thus, even if the burglar or the bank robber have escaped with their stolen property and have even converted it in some way, the return of equivalent value to the homeowner or the bank is better described as compensation to the victim rather than punishment of the criminal.[106]

In sum, because restitution is not criminal punishment, it is not subject to the strictures of the Sixth Amendment.

---

**99.** *See* Pub. L. 104–132, Title II, § 204(a), Apr. 24, 1996, 110 Stat. 1227.

**100.** *See* U.S.S.G. § 5E1.1.

**101.** 344 F.Supp.2d 1310, 1314 (D.Utah 2004).

**102.** *United States v. Nichols*, 169 F.3d 1255, 1279 (10th Cir.1999)(quoting *United States v. Arutunoff*, 1 F.3d at 1121).

**103.** 144 F.3d 531 (7th Cir.1998).

**104.** *Id.* at 538.

**105.** *Hughey v. United States*, 495 U.S. 411, 416, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990).

**106.** 344 F.Supp.2d at 1316.

*Visinaiz* also found no basis in history for extending the right to a jury trial to restitution awards. Traditionally, *Visinaiz* observed, juries did not determine restitution awards.[107] The common law provided, for example, that restitution was a statutory remedy "to be awarded *by the justices* on a conviction of robbery or larceny."[108] As *Visinaiz* noted, "[t]his common law rule was recognized by the Supreme Court in 1842 in *United States v. Murphy:*

> The statute of 21 Hen. VIII., c. 2, gave full restitution of the property taken, after the conviction of an offender, of robbery. The writ of restitution was to be granted by the justices of the assize ...."[109]

This rule, moreover, "was retained in several state statutes in the early years of the Republic."[110] Pennsylvania's petit larceny statute provided, for example, that

> ... if any person or persons shall hereafter feloniously steal, take and carry away any goods, or chattels under the value of twenty shillings ... being thereof legally convicted, shall be deemed guilty of petty larceny, and shall restore the goods and chattels so stolen

or pay the full value thereof to the owner or owners thereof ....[111]

"Forcible entry and detainer," *Visinaiz* continued, was another "crime in which it was common to encounter provision of a restitutionary remedy at common law."[112] So, for example, "[u]pon conviction by a jury of forcible entry and detainer ... *Blackstone's Commentaries* explains that 'besides the fine on the offender, the justices shall make restitution by the sheriff of the possession ....'"[113] In fact, "[m]any states early on criminalized forcible entry upon and detainer of land, and often these statutes authorized the judge to order restitution and the payment of damages upon conviction."[114]

Based on these and other historical precedents discussed in *Visinaiz*, there is no reason for believing that the Sixth Amendment requires jury fact-finding in restitution awards. *Visinaiz*, however, was decided before yesterday's decision in *Booker*. Does *Booker* cast any doubt on the reasoning of *Visinaiz*?

In the court's view, nothing in *Booker* undercuts *Visinaiz*. Like the earlier deci-

---

107.   344 F.Supp.2d at 1323–25.

108.   16 C.J.S. *Criminal Law* § 3255 (1918) (citing 21 Hen. VIII c 11; 7 & 8 Geo. IV c 29 § 57) (emphasis added).

109.   344 F.Supp.2d at 1323 (quoting *U.S. v. Murphy*, 41 U.S. 203, 206, 16 Pet. 203, 10 L.Ed. 937 (1842)).

110.   *Id.* (citing Act of September 15, 1786 (12 St.L. 282–283 Ch. 1241 (Penn.))); *Ross v. Bruce*, 1 Day 100 (Conn.1803) (citing state statute 413 authorizing "treble damages" for theft); *Commonwealth v. Andrews*, 2 Mass. 14, 24, 1806 WL 735, *7 (Mass.1806) (citing larceny act of March 15, 1785, authorizing award of treble the value of goods stolen to the owner upon conviction).

111.   Act of September 15, 1786 (12 St. L., 282–283 Ch. 1241, (Penn.)).

112.   344 F.Supp.2d at 1324. .

113.   *Id.* (quoting 4 BLACKSTONE COMM. p. 117 (2001 Mod. Engl. ed. of the 9th ed. of 1793)).

114.   *Id.* (citing *Allen v. Ormsby*, 1 Tyl. 345 (Vt.1802)) (citing sec. 5 of the forcible entry and detainer act of February 27, 1797; *Crane v. Dod*, 2 N.J.L. 340 (N.J.1808) (citing sec. 13 of the state's forcible entry and detainer act providing for an award of "treble costs"); *People ex rel. Corless v. Anthony*, 4 Johns. 198 (N.Y.Sup.1809) (citing St. 11th Sess. c. 6, forcible entry and detainer statute authorizing an award of restitution and damages to the aggrieved party). *But see Commonwealth v. Stoever*, 1 Serg. & Rawle 480 (Pa.1815) (no damages allowed under state's forcible entry and detainer statute).

sions on which it is based, *Booker* focuses on the unfairness of judicial fact-finding undergirding a longer *prison* sentence for a criminal defendant. In *Booker*, for example, the defendant received an additional eight years in prison because of the quantity of cocaine involved in his offense.[115] Moreover, the reasoning of *Booker* rests on findings of fact essential to "punishment."[116] The Court nowhere indicates what is considered to be "punishment." For all the reasons explained above, restitution should not now be considered punishment and historically never has been considered punishment; it therefore lies outside the Sixth Amendment's jury requirements.

■ Because the provisions of the MVRA are constitutional in the wake of *Booker*, the court orders defendant Wilson to pay restitution to the victim credit union in the amount of $9,795.15. As explained by this court in its opinion in *United States v. Bedonie*, this amount is due immediately, payable on a schedule.[117] The court sets a schedule of $25 per quarter while in prison and $100 per month upon release.

E.   No Continuance of the Proceedings.

The court has hastened to produce an opinion on all of these subjects because they will recur in a large number of cases here and perhaps in other courts as well. The court is also reluctant to delay the sentencing in this matter to ponder over the meaning of *Booker*. The Wilson sentencing has already been delayed more than a month. As noted above, defendant Wilson's crimes are extremely serious and have caused considerable trauma and anxiety to his victims. Congress has recently mandated that victims have the right "to proceedings free from unreasonable delay."[118] The court sees no reason for delay.

At the same time, however, the court realizes that its opinion may touch on subjects about *Booker* that the parties wish to brief. Accordingly, the court will hold the judgment in this matter in abeyance for ten days to give either side an opportunity to file any objection to any of the conclusions in this opinion.

## CONCLUSION

It may be appropriate to offer a concluding observation. The court has determined that it will generally hew to the Guidelines in imposing criminal punishments. No doubt, some criminal defendants will be disappointed by this result. Yet in the long run, such an approach may be the best way to develop a fair and consistent sentencing scheme around the country for the benefit of defendants, victims, and the public. As *Booker* itself recognized, the judiciary's view on how to proceed "of course, is not the last word: The ball now lies in Congress' court. The National Legislature is equipped to devise and install, long-term, the sentencing system compatible with the Constitution, that Congress judges best for the federal system of justice."[119] The congressional view of how to structure that sentencing system will surely be informed by how judges respond to their newly-granted freedom under the "advisory" Guidelines system.

**115.** *Booker*, —— U.S. at ——, 125 S.Ct. at 745, 2005 WL 50108, at *4.

**116.** *Id.* at —— U.S. at ——, 125 S.Ct. at 749, 2005 WL 50108, *8 (recounting *Blakely* decision).

**117.** 317 F.Supp.2d 1285, 1329 (D.Utah 2004) (appeal pending).

**118.** 18 U.S.C. § 3771(a)(7).

**119.** *Booker*, —— U.S. at ——, 125 S.Ct. at 768, 2005 WL 50108, at *28.

If that discretion is exercised responsibly, Congress may be inclined to give judges greater flexibility under a new sentencing system. On the other hand, if that discretion is abused by sentences that thwart congressional objectives, Congress has ample power to respond with mandatory minimum sentences and the like. The preferable course today is to faithfully implement the congressional purposes underlying the Sentencing Reform Act by following the Guidelines in all but unusual cases.

Accordingly, the defendant is sentenced to a term of 188 months in prison—the term the Guidelines prescribe. The defendant is also ordered to pay restitution of $9,795.15 to the credit union he robbed. The judgment will be held in abeyance for ten days to allow briefing on these conclusions from either side.

SO ORDERED.