UNITED STATES of America,
Plaintiff,

v.

James Joseph WILSON, Defendant.

No. 2:03–CR–00882 PGC.

United States District Court,
D. Utah,
Central Division.

Feb. 2, 2005.

Barbara Bearnson, Esq., U.S. Attorney's Office, Salt Lake City, UT, for Plaintiff.

Mark S. Kouris, Esq., Utah Federal Defender Office, Salt Lake City, UT, for Defendant.

## MEMORANDUM OPINION AND ORDER REAFFIRMING DECISION TO GIVE GREAT WEIGHT TO THE SENTENCING GUIDELINES IN DETERMINING APPROPRIATE SENTENCES

CASSELL, District Judge.

Nearly three weeks ago, defendant James Wilson came before the court for sentencing on an armed robbery. Because the sentencing occurred one day after the Supreme Court's decision in *United States v. Booker*,[1] the court was required to consider the Federal Sentencing Guidelines in their "advisory" capacity. The court issued a memorandum decision explaining that it would give strong consideration to the Guidelines sentence, although varying from the Guidelines only "in unusual cases for clearly identified and persuasive reasons."[2] With respect to defendant Wilson, the court determined that the Guidelines called for a prison sentence of not less than 188 months. Finding no good reason to vary from the Guidelines, the court imposed that sentence and gave both sides ten days to file any objections.

Since the court's initial decision in this case, several other district courts around the country have offered their analysis of the weight to be given to the Guidelines in the wake of *Booker*. Notably, *United States v. Ranum*[3] rejects this court's ap-

---

1. —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

2. *Wilson*, 350 F.Supp.2d 910, 911 (D.Utah 2005).

3. 353 F.Supp.2d 984 (E.D.Wis.2005).

proach, concluding that heavy weight should not be given to the Guidelines because they "either reject or ignore" many of the factors that are pertinent to determining an appropriate sentence.[4] *Ranum's* approach has been adopted by several other district courts.[5] Not surprisingly, defendant Wilson has now filed a motion to reconsider, asking this court to follow *Ranum* and give him a sentence lower than the Guidelines.

It is troubling to find disagreement on the basic approach to calculating federal prison sentences, particularly where Congress has commanded courts to avoid "unwarranted sentencing disparity."[6] But after reflection, the court respectfully believes that *Ranum* and other cases like it are incorrectly decided—at least as to their methodology. After careful consideration, the court therefore denies Wilson's motion.

This court remains convinced that it should give great weight to the Sentencing Guidelines in determining the appropriate sentence, varying from the Guidelines only in rare cases. The Guidelines system fully reflect congressional purposes of punishment. The factors the Guidelines considers, and the weight to be given to those factors, have generally been approved by Congress. Moreover, heavy reliance on the Guidelines is the only way to avoid unwarranted sentencing disparity. The court accordingly rejects defendant Wilson's motion.

## I. THE COMPETING POST-*BOOKER* APPROACHES TO DETERMINING SENTENCES

### A. *United States v. Wilson*

In its first decision in this case, this court examined the structure of the Sentencing Reform Act in the wake of the Supreme Court's decision in *United States v. Booker*.[7] *Booker* held that the Federal Sentencing Guidelines were unconstitutional because they relied on judicial factfinding, rather than the jury factfinding required by the Sixth Amendment's jury trial right. *Booker* further held that the remedy for this constitutional defect was to sever the provisions in the Sentencing Reform Act that rendered the Guidelines mandatory, thus leaving in place "advisory" Guidelines.[8]

In its earlier decision, this court concluded that the recommended Guidelines sentence should receive considerable weight. Guidelines sentences typically achieve congressional objectives. They appear to track the public's view as to just punishment and are well-designed to incapacitate serious offenders and deter would-be criminals. Finally, the Guidelines are the only available common standard for judges to use in crafting sentences. Heavy reliance on the Guidelines is thus the only way to implement the congressional directive for courts to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct . . . ."[9]

---

4. *Id.* at 985, 2005 WL 161223, *1.

5. *United States v. Myers,* 353 F.Supp.2d 1026 (S.D.Iowa 2005); *United States v. West,* 2005 WL 180930 (S.D.N.Y. Jan. 27, 2005); *see also United States v. Huerta–Rodriguez;* 355 F.Supp.2d 1019, 2005 WL 318640 (D.Neb. 2005), *available at* http://sentencing.typepad.co m/sentencing_law_and_policy/files/judge_bataillon_huerta_ruling.pdf. (last visited Feb. 2, 2005).

6. 18 U.S.C. § 3553(a)(6).

7. —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

8. This court has also held that the Guidelines are advisory in the "safety valve" context. *See United States v. Duran,* 2005 WL 234778, 2:04–CR–396–PGC (D.Utah Jan. 31, 2005).

9. 18 U.S.C. § 3553(a)(6).

■ Accordingly, in its earlier opinion, this court set out the approach it would follow in all sentencings. First, the court will calculate the advisory guideline sentence. This calculation will reflect the Guidelines offense level and criminal history category, adjusted by any departures that the Guidelines suggest. In other words, the advisory sentence requires determining whether an offense falls inside or outside the "heartland" of the Guidelines. If outside, the court will determine the appropriate extent of a departure under the Guidelines system as part of determining the recommended Guidelines sentence.

■ Having thus determined the advisory Guidelines sentence, the court would then determine whether it should *vary* that sentence to reflect any unique circumstances of the particular case. (Terminology can get a bit tricky here; to avoid confusion, it seems best to use the term "departure" as reflecting its settled meaning of a difference from an otherwise-specified Guidelines sentence approved by the Guidelines themselves,[10] and a new term— perhaps "variance"—as meaning a difference from the Guidelines system that is not called for by the Guidelines themselves. The Second Circuit has suggested the term "non-Guidelines sentence" might serve as the distinguishing term from "departure."[11] However, that still leaves a void in that no verb is available to describe a court's action in such circumstances— "variance" has the advantage of including the verb form "vary.") Variances would

be rare—the court suggested its sentences would vary from the Guidelines only "in unusual cases for clearly identified and persuasive reasons."[12]

■ Applying this approach to the case at hand, the court determined that the advisory Guidelines sentence for defendant Wilson's armed bank robbery was at least 188 months in prison. The court arrived at this sentence by looking at the "real offense" committed by Wilson—that is, by looking beyond the mere offense of conviction (armed bank robbery) to what actually happened. Thus, the court increased the Guidelines base offense level for robbery because the defendant took the property of a financial institution, brandished a sawed-off shotgun at several tellers, and left the bank with more than $10,000.[13] After an adjustment for acceptance of responsibility and for the defendant's history as an armed career criminal, and application of a criminal history category of VI, the resulting Guidelines range of 31 called for a sentence of no less than 188 months.

The court also concluded that *Booker* required the real offense be determined through judicial factfinding under a preponderance of the evidence standard. Because this conclusion has since been disputed by several courts,[14] it is appropriate to briefly explicate this point. *Booker's* "remedial majority" (that is, the majority opinion authored by Justice Breyer) carefully considered whether to engraft onto the Guidelines the constitutional requirements of the Sixth Amendment—jury de-

10. *See* U.S.S.G., Chapter 5, Part K ("Departures").

11. *United States v. Crosby,* 397 F.3d 103, 2005 WL 240916 *14 n. 9 (2nd Cir.2005).

12. *Wilson,* at 911.

13. *See* P.S.R. at 6 (base offense level of 20 from § 2B3.1, increased by 2 levels under

§ 2B3.1(b)(1)) (property of financial institution), increased by 5 levels under § 2B3.1(b)(2)(A) (brandishing of firearm), increased by 1 level under § 2B3.1(b)(7)(B) (loss of more than $10,000).

14. *See, e.g., U.S. v. Huerta–Rodriguez,* 355 F.Supp.2d 1019, 2005 WL 318640 (D.Neb. 2005); *see also United States v. Blarkley,* Case No. 04–CR–119 (N.D.Okla. Jan. 24, 2005).

terminations and proof beyond a reasonable doubt. The remedial majority flatly rejected any such remedy, concluding it "would destroy the system":

> To engraft the Court's constitutional requirement onto the sentencing statutes ... would prevent a judge from relying upon a presentence report for factual information, relevant to sentencing, uncovered after the trial. In doing so, it would, even compared to pre-Guidelines sentencing, weaken the tie between a sentence and an offender's real conduct. It would thereby undermine the sentencing statute's basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways.[15]

To avoid destroying "the system," the remedial majority severed only the two provisions in the Sentencing Reform Act that rendered the Guidelines mandatory,[16] concluding that with these provisions gone "the remainder of the Act satisfies the Court's constitutional requirements." [17] Of course, this court is obligated to follow the holding of the "remedial majority" in *Booker* and give effect to its conclusion that "the remainder of the Act" remains in place. Therefore, the court must determine the advisory Guidelines range in the way that it always has, through judicial fact-finding under a preponderance of the evidence standard. (Just today, the Second Circuit reached the same conclusion.[18])

Having determined Wilson's advisory Guidelines sentence in the traditional manner, the court then exercised its discretion and considered whether there was some good reason for varying from the Guidelines. Finding no sound reason for a variance from that sentence, the court imposed the recommended sentence of 188 months. The court also held the judgment open for ten days to allow either side to object to any of the court's conclusions.

### B. *United States v. Ranum*

Defendant Wilson has now filed an objection to the court's earlier conclusion. Wilson urges that, instead of giving heavy weight to the Guidelines, the court should follow the more flexible approach to sentencing explicated by Judge Adelman of the Eastern District of Wisconsin in *United States v. Ranum.*[19] *Ranum* began—as this court did in *Wilson*—by reciting the congressionally-mandates purposes of criminal sentences laid out in 18 U.S.C. § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner .... [20]

*Ranum* went on to reject this court's analysis in *Wilson*, concluding that:

> The directives of *Booker* and § 3553(a) make clear that courts may no longer

---

**15.** *Booker,* —— U.S. at ——, 125 S.Ct. at 760.

**16.** *Id.* at 765 (invalidating 18 U.S.C. § 3553(b)(1) and § 33742(e)).

**17.** *Id.*

**18.** *United States v. Crosby,* 397 F.3d 103, 118, 2005 WL 240916 at *9 (2nd Cir.2005).

**19.** *See* Defendant's Memo. on Application of *U.S. v. Booker* at 13 (citing, *Ranum,* 353 F.Supp.2d 984, 2005 WL 161223 (E.D.Wis. 2005)).

**20.** 18 U.S.C. § 3553(a)(2).

uncritically apply the guidelines and, as one court suggested, 'only depart . . . in unusual cases for clearly identified and persuasive reasons.' The approach espoused in *Wilson* is inconsistent with the holding[ ] of . . . *Booker*, directing courts to consider all of the § 3553(a) factors, many of which the guidelines either reject or ignore.[21]

*Ranum* went on to list various factors which were, in its view, relevant to sentencing but excluded from consideration by the Guidelines—e.g., a defendant's socioeconomic status, his family ties and responsibilities, his lack of guidance as a youth, and so forth.[22] *Ranum* held these exclusions "cannot be squared" with the congressional directive that courts must consider "the history and characteristics of the defendant" in determining an appropriate sentence.[23]

*Ranum* also noted that one of the purposes of sentencing—providing the defendant with appropriate education, training, treatment or medical care—might conflict with a Guidelines-mandated prison sentence.

*Ranum* also spelled out a different procedural approach to calculate the advisory Guidelines sentence. *Ranum* saw no need for courts to

> [F]ollow the old "departure" methodology. The guidelines are not binding, and courts need not justify a sentence outside of them by citing factors that take the case outside the 'heartland.' Rather, courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as . . . the

ultimate sentence is reasonably and carefully supported by reasons tied to the § 3553(a) factors.[24]

Applying this approach to calculate defendant Ranum's sentence, the court imposed a sentence of a year and a day for bank fraud—well below the recommended minimum Guidelines sentence of 37–46 months. The rationale for this lower sentence included the defendant's motivation for the fraud (he was attempting to keep his business afloat) as well as the significant "collateral consequences" of a criminal conviction (he lost his job in the banking industry).

Judge Adelman's analysis in *Ranum* has proven influential. Shortly after *Ranum* was decided, Judge Pratt of the Southern District of Iowa noted the disagreement between *Wilson* and *Ranum*, electing to side with *Ranum*. In *United States v. Myers*,[25] Judge Pratt concluded that "the Guideline provisions and the statutory provisions under section 3553(a) often contradict one other."[26] *Myers* cited the same factors mentioned in *Ranum*—a defendant's socioeconomic status, his family ties and responsibilities, his lack of guidance as a youth, and so forth—as factors unfairly excluded from consideration by the Guidelines. Based on the *Ranum* methodology, defendant Myers received a sentence of probation for illegal possession of a firearm—a sentence well below the Guidelines range (20 to 30 months in prison). Similarly, in *United States v. West*,[27] Judge Sweet of the Southern District of New York noted the competing approaches of *Wilson* and *Ranum*. He also elected to follow the more flexible approach of *Ranum*, conclud-

**21.** *Ranum*, at 985, 2005 WL 161223, at *1.

**22.** *Id* at 1, 2. (citing, *inter alia*, U.S.S.G. §§ 5H1.6, 5H1.5, 5H1.12) (policy statement).

**23.** 18 U.S.C. § 3553(a)(1).

**24.** *Ranum*, at 986, 2005 WL 161223, *2.

**25.** 353 F.Supp.2d 1026, 2005 WL 165314 (S.D.Iowa 2005).

**26.** *Id.* at 1028, 2005 WL 165314 *2.

**27.** 2005 WL 180930 (S.D.N.Y. Jan.27, 2005).

ing that § 3553(a) requires courts "to consider a host of individual variables and characteristics excluded from those calculations called for by the Guidelines."[28] Finally, Judge Bataillon of the District of Nebraska tracked *Ranum's* approach in *United States v. Jose Huerta–Rodriguez*. He rejected the government's position (which tracked *Wilson*) that "a criminal sentence should fall within the Guidelines range, absent highly unusual circumstances."[29] Instead, he determined he would make a more individualized assessment of the appropriate penalty "with the knowledge that the Guidelines do not necessarily represent a reliable indication of reasonableness in every case . . . ."[30]

## II. THE COMPELLING REASONS FOR GIVING GREAT WEIGHT TO THE GUIDELINES

In light of defendant Wilson's motion to reconsider, this court has carefully considered whether to revise its earlier approach and follow the course charted by *Ranum* and several other courts. The court is troubled that Wilson has received different treatment of his claims than he would in other courts. After careful review of the issues, however, the court remains convinced that its earlier decision was correct. Defendant Wilson's motion to reconsider in light of *Ranum* is therefore denied.

*Ranum's* more flexible approach is flawed. First, it significantly alters without clear justification the Guidelines approach of giving limited effect to offender characteristics. This court cannot agree with *Ranum*, for example, that an offender's socioeconomic status is a relevant factor in determining a sentence. Moreover, the Commission has carefully calibrated the extent to which offender characteris-

tics determine a sentence. Unlike the Guidelines, *Ranum* offers no real basis for deciding which offender characteristics to consider and how much consideration to give them.

Second, *Ranum* gives undue emphasis to the prospect that an offender might become rehabilitated while in prison. In enacting the Sentencing Reform Act, Congress specifically gave rehabilitation a secondary role in determining prison sentences. The Guidelines properly implement this congressional determination.

Third, *Ranum* pays little attention to the requirement that courts avoid unwarranted sentencing disparity. Only close adherence to the Guidelines offers any prospect of treating similarly-situated offenders equally.

### A. The Guidelines Handle Specific Offender Characteristics Appropriately.

The central disagreement between *Wilson* and *Ranum* is the weight to be given to various offender characteristics. *Ranum* holds that the Guidelines "cannot be squared" with the congressional directive that courts must consider "the history and characteristics of the defendant" in determining an appropriate sentence.[31] *Ranum* argues that Guidelines unfairly block consideration of relevant offender characteristics:

> [U]nder the guidelines, courts are *generally forbidden* to consider the defendant's age, U.S.S.G. § 5H1.1, his education and vocational skills, § 5H1.2, his mental and emotional condition, § 5H1.3, his physical condition including drug or alcohol dependence, § 5H1.4, his employment record, § 5H1.5, his family ties and responsibilities, § 5H1.6, his so-

**28.** *Id.* at *2.

**29.** *Huerta–Rodriguez,* at 1024, 2005 WL 318640 at *3.

**30.** *Id.* at 1027, 2005 WL 318640 at *4.

**31.** 18 U.S.C. § 3553(a)(1).

cio-economic status, § 5H1.10, his civic and military contributions, § 5H1.11, and his lack of guidance as a youth, § 5H1.12. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history.[32]

This part of *Ranum* has been specifically endorsed by *Myers*[33] and *West*.[34] Defendant Wilson urges this court to follow the approach of these others courts.

At the outset, there is reason to be skeptical of the assertion that the Guidelines are inconsistent with the congressionally-created purposes of sentencing. The Guidelines are a carefully-calibrated system put in place by Congress.[35] In 1984, after nine years of bipartisan deliberation and compromise, Congress passed the Sentencing Reform Act to create a guidelines system. The Act created an expert agency—the Sentencing Commission—to determine ranges of appropriate sentences. In developing the Guidelines, the Commission developed sentencing ranges based on past practice as reflected in 10,-000 presentence reports and additional data on over 100,000 federal sentences imposed in the immediate preguidelines era. The Commission then adjusted sentencing ranges for compelling reasons, including directions from Congress. In the seven-

teen years since the promulgation of the Guidelines, the Commission has continued to closely monitor the Guidelines, making adjustments where appropriate. Congress, too, has been heavily involved in this calibration, reviewing all of the amendments to the Guidelines and making amendments itself where appropriate.[36] As Senators Hatch, Kennedy, and Feinstein explained in their *amicus* brief in *Booker*, "Since 1984, Congress has continued to monitor this area of law and has made revisions to the sentencing guidelines system through amendments to the 1984 Act and other legislation."[37]

In light of this history, it would be remarkable to discover (as *Ranum* claims) that significant parts of the Guidelines "cannot be squared" with the congressionally-created purposes of sentencing.[38] Instead, the more logic conclusion is that the Guidelines—including its handling of offender characteristics—generally reflect congressional purposes.

### 1. Offender Characteristics Can Be Considered Within the Guidelines.

Relying on *Ranum*, defendant Wilson contends that the Guidelines "forbid" consideration of offender characteristics. This contention is wrong. With only a few well-justified exceptions (such as the racial characteristics of a defendant, discussed below), the Guidelines policy statements specifically allow use of such characteristics.[39] In the introductory

---

**32.** *Ranum*, at 985, 2005 WL 161223, at *1 (emphasis added).

**33.** 353 F.Supp.2d at 1026, 2005 WL 165314 (S.D.Iowa 2005).

**34.** 2005 WL 180930 (S.D.N.Y. Jan. 27, 2005).

**35.** *See generally* U.S. Sentencing Comm'n 15 Year Report at iv-xix.

**36.** *See Wilson,* at 916 (collecting examples of amendments made to the Guidelines).

**37.** *Brief of Amici Curiae, United States v. Booker* at 2, 4.

**38.** *Ranum,* at 985, 2005 WL 161223, at *1.

**39.** *See* U.S.S.G., Part H (policy statements); *see also Williams v. U.S.,* 503 U.S. 193, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) (policy statements are an "authoritative guide" to the meaning of the Guidelines).

commentary to the Guidelines offender characteristics section, the Commission explains that certain circumstances are "not *ordinarily* relevant" to the determination of whether to impose a sentence "*outside* the applicable Guideline range."[40] However, the Commission continues: "Unless expressly stated, this does not mean that the Commission views such circumstances as necessarily inappropriate to the determination of the sentence *within* the applicable guideline range or to the determination of various other incidents of an appropriate sentence ...."[41] Moreover, the Commission goes on to explain that there may be "exceptional cases" in which an offender characteristic, either alone or in combination with other unusual circumstances of a case, would be grounds for a departure from the Guidelines.[42] Thus, the Guidelines limit the weight to be given to most offender characteristics, not forbid that they be given any weight.[43] The are, however, several forbidden characteristics.

### 2. The Forbidden Characteristics Should Be Forbidden.

The Guidelines forbid courts to consider an offender's race, sex, national origin, creed, religion, and socioeconomic status.[44] These prohibitions come directly from Congress. In the Sentencing Reform Act, Congress mandated "[t]he Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders."[45] The reason for this clear direction is set out in the relevant legislative history. The Senate Judiciary Committee explained: "The Committee [sought] to make it *absolutely clear* that it was not ... suggest[ing] in any way that the Committee believed that it might be appropriate, for example, to afford preferential treatment to defendants of a particular race or religion or level of affluence ...."[46] The House Judiciary Committee agreed: "If guidelines are to reduce inappropriate disparity, they must not be based on factors that reflect gender, race, religion or socioeconomic status."[47] Thus, as Congressman Feeney later explained: "The concept [behind the 1984 reforms] was clear: Justice should be the same for all, regardless of one's race, gender, status, or socioeconomic background."[48]

The congressional command is fully justified. It is doubtful whether anyone would argue for giving longer prison terms to defendants based merely on their race, sex, national origin, or creed. Interestingly, *Ranum* does not mention these characteristics, much less argue they are something that the Guidelines have unfairly removed from consideration.

*Ranum* does specifically attack the Guidelines prohibition of considering socioeconomic status when imposing sentence. *Ranum* concludes that this is a relevant sentencing factor and goes on to impose a

---

**40.** U.S.S.G., Part H, Introductory Commentary (policy statement) (emphases added).

**41.** *Id.* (policy statement).

**42.** *Id.* (policy statement).

**43.** *See* U.S. Sentencing Comm'n, Report to Congress: Downward Departures from the Federal Sentencing Guidelines at A–30 (2003)

**44.** U.S.S.G. § 5H1.10 (policy statement).

**45.** 28 U.S.C. § 994(e).

**46.** S. Rep. 98–222, 98th Cong., 1st Sess 168 (1983) (emphasis added).

**47.** H. Rep. 98–1017, 98th Cong., 2d Sess 105 (1984).

**48.** Hon. Tom Feeney, *Reaffirming the 1984 Sentencing Reforms*, 27 Hamline L. Rev. 383 (Summer 2004).

substantially lower sentence due, in part, to defendant Ranum's successful position as a bank executive. But Congress had compelling reasons for condemning precisely this kind of analysis. The public must be confident that in something as fundamental as criminal punishment, rich and poor alike are treated fairly. As the Supreme Court explained in guaranteeing counsel for indigent offenders on appeal, it is fundamentally unfair to create a system "where the rich man can require the court to listen to argument of counsel before deciding on the merits, but a poor man cannot."[49]

To be sure, legal academics have made theoretical arguments for considering socioeconomic status when determining a sentence—although they have reached conflicting conclusions about whether this high status or low status should result in lower prison sentences. For example, well-known law and economics scholar John R. Lott has argued that high status offenders suffer greater "reputational penalties" for a conviction and therefore should receive less prison time.[50] On the other side, leftist scholars have argued that those of lower socioeconomic status deserve lighter sentences, reasoning that when society has failed to provide for adequate education, health care, and housing, an offender has no debt to society to pay.[51] Defendant Wilson seems to advance a variant of this argument in his brief.[52] But these views are the extremes. The main-

stream view is represented by Congress' direction to treat rich and poor equally. There is no good reason to second-guess that judgment.

An additional reason for caution in considering socioeconomic in sentencing decisions is the potential for racial disparities. Socioeconomic status is clearly correlated with race. For example, in a recent survey, the U.S. Census Bureau reported that the poverty rate in 2003 for white households was 8.2 percent and 24.3 percent for African–American households.[53] This is not the occasion for sorting out the contributing reasons for these racial disparities. But in light of this clear racial component, injecting socioeconomic status into sentencing decisions will effectively create racial differences.

Comparing Wilson's case with *Ranum* will conveniently illustrate the potential unfairness. Defendant Wilson is an African–American with low socioeconomic status. According to the pre-sentence report, he apparently grew up in a single-parent household with limited means. He has had limited luck obtaining employment and has no financial assets. On the other hand, defendant Ranum is a white defendant with a high socioeconomic status. He received a sentence lower than the Guidelines due in part to the "significant collateral effects" of the prison conviction, including specifically the fact that he lost a

**49.** *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

**50.** John R. Lott, *Optimal Penalties Versus Minimizing the Level of Crime: Does it Matter Who is Correct?,* 71 B.U.L. Rev. 439, 442 (1991); *see also* Jonathan M. Karpoff & John R. Lott, *Why the Commission's Corporate Guidelines May Create Disparity,* 3 Fed. Sent. Rptr. 140 (Nov.1990).

**51.** *See, e.g.,* Jeffrie Murphy, *Marxism and Retribution,* in Punishment: A Philosophy and

Pub. Affairs Reader 23–38 (A. John Simmons et al. eds.1995).

**52.** Defendant's Sentencing Memo. Regarding the Application of *U.S. v. Booker* at 12.

**53.** Press Briefing, U.S. Census Bureau, 2003 Income and Poverty Estimate from the Current Population Survey (Aug. 25, 2004), *available at* http://www.census.gov/hhes/income/income03/prs04asc.html (last visited Feb. 1, 2005).

good job at a bank and would be unable to work in banking again.[54]

To be sure, Wilson deserves a longer sentence than Ranum because he committed a more serious crime (bank robbery versus bank fraud). But the issue we are now considering is whether, in determining the ultimate sentence, Ranum should get a break that Wilson does not. In other words, once the *offense* characteristics have been fully considered, should Wilson serve more time than Ranum because of his *offender* characteristic of being from a lower socioeconomic status. Congress has directed—and this court agrees—that socioeconomic status must not be considered.

3. Other Offender Characteristics Deserve the Modest Weight Assigned by the Commission.

Apart from the forbidden characteristics, many other offender characteristics can generally be taken into account (as explained earlier) only within the relevant Guidelines range. *Ranum* appears to find this restriction too confining and contends that the courts should routinely consider these factors as reasons for going outside the Guidelines. *Ranum* singles out as possibly justifying outside-the-Guidelines sentences such factors as family ties and responsibilities, lack of guidance as a youth, age, vocational skills, mental and emotional condition, physical condition including drug or alcohol dependence, employment record, and civic and military contributions.[55] Again, defendant Wilson asks this court to follow *Ranum's* approach by considering such factors.[56]

This approach is inconsistent with congressional mandates. In passing the Sentencing Reform Act, Congress required the Sentencing Commission to investigate whether and to what extent many of these factors were relevant to sentences. Congress directed that, in creating the Guidelines, the Commission "shall consider whether the following matters, among others, with respect to the defendant, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance—[listing factors]."[57] Most of the restrictions that *Ranum* finds problematic have been in place since the Guidelines initial promulgation in 1987. Congress has had nearly two decades to reject any of these restrictions if they were inconsistent with the basic purposes of sentencing. Instead, Congress has (if anything) moved to tighten up these restrictions.

One illustration comes from the family ties Guidelines, which provides that "family ties and responsibilities" are "not ordinarily relevant" to determining whether a sentence should be outside the Guidelines.[58] Congress has not questioned this provision since its promulgation in November 1, 1987. To the contrary, in 2003 in the PROTECT Act, Congress directly amended this policy statement for certain cases. Congress provided that for child sex abuse cases, this provision would be changed from indicating that family ties "are not ordinarily relevant" to family ties "are not relevant" in determining whether to impose a sentence below the Guidelines range.[59]

---

54. *Ranum*, at 985, 2005 WL 161223, at *6.

55. *Ranum*, at 985, 2005 WL 161223, at *1.

56. Defendant's Sentencing Memo. Regarding Application of *U.S. v. Booker* at 12.

57. 28 U.S.C. § 994(d).

58. U.S.S.G. § 5H1.6 (policy statement).

59. Pub.L. 108–21, Section 401(b)(4) (eff.Apr. 30, 2003).

To be sure, this amendment (like others in the PROTECT Act) directly applies only to certain child sex abuse offenses. But this amendment is surrounded by many additional amendments designed to make it more difficult for courts to depart downward from the Guidelines in all cases. For instance, the PROTECT Act required district courts to include written reasons for any departure in the judgment and commitment order and to base all departures on factors furthering the statutory purposes of sentencing.[60] The Act also directed appellate courts to take a more stringent review of departures by changing the standard of review to *de novo* and requiring the Department of Justice to more aggressively challenge departures. Most important, the Act directed the Commission to tighten up the Guidelines to "ensure that the incidence of downward departures are *substantially reduced* . . . ."[61] Given this clear and recent legislative action, it is hard to understand how faithfully implementing the congressional intent could now justify varying from the Guidelines with even greater frequency on such grounds as family ties.

*Ranum* also concluded that it would not follow the Commission's policy statement on lack of youthful guidance.[62] The lack-of-guidance provision directs that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."[63] The lack-of-guidance provision

overruled a 1991 Ninth Circuit decision—*United States v. Floyd*[64]—which had affirmed a district court's downward departure based on a mitigating circumstance it characterized as "youthful lack of guidance."[65] *Floyd* was described by one commentator as "frankly bizarre."[66] Two members of the Sentencing Commission (Judge and former Chairman William Wilkins and John Steer)—later explained why *Floyd* was uniquely singled out to be effectively overruled by the Commission:

The strength of Commission disapproval of "lack of youthful guidance" as a basis for departure can be attributed to a number of factors. Among them was a concern that this particular label, amorphous as it is, potentially could be applied to an extremely large number of cases prosecuted in federal court, thereby permitting judges wide discretion to impose virtually any sentence they deemed appropriate (within or below the guidelines). The unwarranted disparity that could result from such a wide-open path around the guidelines was inconsistent with [Sentencing Reform Act] objections as the Commission understood them. Moreover, departures predicated on this factor could reintroduce into the sentencing equation considerations of a defendant's socioeconomic background and other personal characteristics that Congress clearly intended the guidelines to place off limits.[67]

In addition, the Commission acted only after receiving comments from around the country, facilitated by a *Federal Register* notice announcing the pendency of this amendment.[68] In the wake of all this care-

**60.** 18 U.S.C. § 3553(c).

**61.** Pub.L. 108–21, Section 401(m), 117 Stat. 650, 674.

**62.** *Ranum*, at 985, 2005 WL 161223, at *1.

**63.** U.S.S.G. § 5H1.12 (policy statement).

**64.** 945 F.2d 1096 (9th Cir.1991).

**65.** *Id.* at 1099.

**66.** Michael M. Baylson, *Mandatory Minimum Sentences: A Federal Prosecutor's Viewpoint*, 40 Fed. B. News & J. 167, 169 n. 35 (1993).

**67.** William W. Wilkins & John R. Steer, *The Role of Sentencing Guideline Amendments in Reducing Unwarranted Sentencing Disparity*, 50 Wash. & Lee L. Rev. 63, 84–85 (1993).

**68.** 57 Fed. Reg. 90–01 (proposed Jan. 2, 1992) (to be codified at U.S.S.G. § 5H1.12 (policy

ful study and consideration underlying the youthful guidance provision, it seems remarkable to quickly and without apparent consideration of the competing concerns to broadly announce (as *Ranum* seemingly has) that the provision is fundamentally at odds with the purposes of sentencing.

These examples could be multiplied. But the general point here is that *Ranum* provides no clear reasons for treating offender characteristics differently the "advisory" Guidelines.

### 4. Institutional Advantages of the Sentencing Commission.

As these illustrations hopefully make clear, whether and to what extent offender characteristics should make a difference in criminal sentences is exceedingly complex. The Sentencing Commission has spent many years calibrating the Guidelines so that offender characteristics receive appropriate weight under the Guidelines. It has placed some characteristics—such as race and socioeconomic status—entirely off limits. Other characteristics (e.g., gambling addiction, lack of youthful guidance) can operate to affect a sentence, but only *within* a particular Guidelines range; they cannot justify a downward departure. Still others (e.g., family ties) are not "ordinarily relevant" for downward departures, but can justify such a departure in exceptional cases.

Without apparent analysis of the nuanced approach of the Guidelines, the history underlying these provisions, or the competing concerns involved, *Ranum* simply declares that the Guidelines' approach "cannot be squared" with the requirement that the court consider the "history and characteristics of the defendant." [69] The basis for *Ranum*'s declaration is not immediately clear. The Sentencing Commission has, of course, significant institutional advantages in determining whether use of certain factors can be squared with the purposes of punishment. Indeed, Congress commanded that the Commission make precisely this determination in drafting the Guidelines.[70] Since then, the Commission has monitored the Guidelines by collecting data on what factors courts are considering in thousands of cases around the country. The Commission also solicits public comment on proposed Guidelines changes through the *Federal Register* and holds hearings on the merits of those changes. During summer 2003, for example, as part of its complete review of departure issues, the Commission solicited and weighed public comment and held two public hearings to receive testimony from the Department of Justice, judges, federal defendants and prosecutors, and experts in the criminal law on downward departures.[71]

More important, the Commission and the Congress have worked closely together to insure that the Sentencing Guidelines faithfully implement the congressionally-prescribed purposes of sentencing. In recent years, Congress has made clear its concern was not (as *Ranum* would have it) that offender characteristics are receiving too *little* attention in downward departure decisions, but rather too *much*. Thus, Congress directed—and the Commission implemented—a substantial reduction in the availability of downward departures

---

statement)) (requesting comment on whether Commission should amend its policy statement to provide expressly whether or not courts may consider defendant's lack of youthful guidance for departure from applicable Guidelines range)

**69.** *Ranum*, at 985, 2005 WL 161223, at *1.

**70.** 28 U.S.C. § 994(d).

**71.** U.S. SENTENCING COMMISSION, REPORT TO CONGRESS: DOWNWARD DEPARTURES FROM THE FEDERAL SENTENCING GUIDELINES 18 (Oct.2003).

from the otherwise-applicable Sentencing Guidelines.

In light of all these facts, this court continues to believe that the Guidelines allow appropriate consideration of the history and characteristics of defendants. Therefore, this court rejects defendant Wilson's argument that it should give greater consideration to offender characteristics than called for by the Guidelines. Instead, in exercising its sentencing discretion, this court will give considerable weight to the recommended Guidelines sentence.

### B. Educational and Vocational Training.

*Ranum* also contends that the Sentencing Guidelines may be inconsistent with another purpose of punishment—what is sometimes loosely described as "rehabilitation." Congress has directed that in imposing sentence the courts must consider not only just punishment, deterrence, and incapacitation but also the need for a sentence "to provide the defendant with needed educational or vocation training, medical care, or other correction treatment in the most effective manner." [72] This provision, contends *Ranum*, "might conflict" with a Guidelines sentence because "[i]n some cases, a defendant's educational, treatment or medical needs may be better served by a sentence which permits the offender to remain in the community." [73]

It may be that *Ranum* is advancing the narrow claim that, in some cases, unusual medical needs or similar circumstances warrant a non-prison sentence. If so, the Guidelines already provide flexibility on this point. For example, the Guidelines provide that "extraordinary physical impairment" may be a reason for a downward departure: "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." [74] But defendant Wilson apparently reads *Ranum* as advancing a far broader position. Wilson urges the court to read *Ranum* as suggesting that rehabilitative goals may provide a justification for going below the Guidelines sentence. Wilson concedes the point made by this court in its earlier opinion—that Congress abolished parole as part of the Sentencing Reform Act.[75] But making a virtue out of a vice, he argues "the lack of such [a later assessment by the parole board] makes it all the more important for the district court to make this [rehabilitative] assessment at the time of sentencing." [76]

Wilson's position is capably argued but nonetheless without merit. For the court to give significant weight to the prospect that a defendant like him might at some indeterminate point in the future rehabilitate himself would be at odds with the whole structure of the Sentencing Reform Act.[77] The impetus for the Sentencing Reform Act was the consensus that developed in the 1970s that the hoped-for rehabilitation of offenders was simply not taking place. The iconic statement of this position was Professor Robert Martinson's in-

---

**72.** 18 U.S.C. § 3553(a)(1)(D).

**73.** *Ranum*, at 986, 2005 WL 161223, at *2.

**74.** U.S.S.G. § 5H1.3 (policy statement).

**75.** *See Wilson*, at 912–13 (citing *Booker*, —— U.S. at ——, 125 S.Ct. at 757).

**76.** Defendant's Sentencing Memo. Regarding Application of *United States v. Booker* at 11.

**77.** *See generally* Ilene H. Nagel, *Structuring Sentencing Discretion: The New Federal Sentencing Guidelines*, 80 J. CRIM. L. & CRIMINOLOGY 883 (1990) (one of the first Sentencing Commissioners helpfully outlining this history). This opinion draws heavily on Commissioner Nagel's article in describing the history.

fluential article, which succinctly concluded: "Rehabilitation, tested empirically, is a failure; 'nothing works' as a prison reform program to reduce recidivism."[78] As the Supreme Court later described it, "Rehabilitation as a sound penological theory came to be questioned and, in any event, was regarded by some as an unattainable goal for most cases."[79]

On the heels of such conclusions, Congress turned to crafting the Sentencing Reform Act. In 1976, Senator Edward Kennedy introduced a comprehensive bill to establish sentencing guidelines.[80] Later, Senator Orrin Hatch would join Senator Kennedy to form a formidable bipartisan, legislative team.

The legislation that ultimately became the Sentencing Reform Act specifically rested on a rejection of the rehabilitative ideal. As the Senate Judiciary Committee explained in its report on the legislation:

> Recent studies suggest that this [rehabilitative] approach has failed, and most sentencing judges as well as the Parole Commission agree that the rehabilitation model is not an appropriate basis for sentencing decisions. We know too little about human behavior to be able to rehabilitate individuals on a routine basis or even to determine accurately whether or when a particular person has been rehabilitated.[81]

As a result of this inability to implement a rehabilitative scheme, the Congress created the Guidelines system we have today. In order to achieve greater honesty in sentencing, Congress simply abolished parole. With relatively minor exceptions, the time that the judge imposed was the time that the offender would serve.[82]

In the wake of this flat rejection of rehabilitation as a goal of sentencing, it would be surprising to find it playing a prominent part in the purposes of sentencing laid out by Congress. And the provision that defendant Wilson cites as grounds for focusing on "rehabilitation" does not use this term. Instead, it says that court should consider the need for a sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[83] Given that federal prisons have extensive educational and vocational training programs as well as medical and other treatment facilities, it would be the rare case where the advisory Guidelines prison sentence would need to be ignored to provide this kind of treatment to the defendant. The Senate Report to the Sentencing Reform Act explained precisely this point:

> It is understood, of course, that if the commission finds that the primary purpose of sentencing in a particular kind of case should be deterrence or incapacitation, and that a secondary purpose should be rehabilitation, the recommended guideline sentence should be imprisonment if that is determined to be the best means of assuring such deterrence or incapacitation, notwithstanding the fact that such a sentence would not

**78.** Robert Martinson, *What Works?—Questions and Answers About Prison Reform,* 1974 Pub. Interest, Spring 1984, at 22.

**79.** *Mistretta v. U.S.,* 488 U.S. 361, 363, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (*citing* N. Morris, The Future Of Imprisonment 24–43 (1974); F. Allen, The Decline of the Rehabilitative Ideal (1981)).

**80.** S. 2699, 94th Cong., 2d Sess. (1976).

**81.** S.Rep. No. 98–225, 98th Cong. 1st Sess. at 38 (1983).

**82.** Hon. Stephen Breyer, Federal Sentencing Guidelines Revisited, Remarks at the Roman L, Hruska Institute, Univ. of Nebraska College of Law (Nov. 18, 1998) at 2.

**83.** 18 U.S.C. § 3553(a)(1)(D).

be the best means of providing rehabilitation.[84]

Courts also have great difficulty in predicting at the time of sentencing how a defendant will fare in prison and when he might become rehabilitated. In this case, for example, the court initially imposed a sentence of 188 months. The court cannot say today whether after completing, say, 100 months of his sentence, defendant Wilson will have rehabilitated himself to the point where he is no longer a threat to society.

Nor does the court have great confidence rehabilitation programs actually work. While it is possible that some programs might have success for some offenders,[85] it is virtually impossible for courts to have any success in identifying these offenders. The latest proof of this point came just a few weeks ago in a memorandum from the Director of Federal Bureau of Prisons, reporting that the "boot camp" program would be closed.[86] Despite anecdotal evidence of their success, the National Institute of Justice recently concluded (based on a decade of research) that there was no reduction in recidivism.[87]

For all these reasons, this court will, in the exercise of its discretion, reject any broad claim that it should vary from the Guidelines because of the distant prospect of rehabilitating a defendant.

## C. Following The Guidelines is the Only Way to Avoid Unwarranted Sentencing Disparity.

In relying on *Ranum* to urge a sentence lower than the Guidelines, Wilson also pays inadequate attention to the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."[88] This congressional command is one of the fundamental purposes underlying the Sentencing Reform Act.[89] As *Booker* explains, Congress' "basic statutory goal in enacting the Guidelines was to provide a sentencing system that diminishes sentencing disparity"[90] and "to move the sentencing system in the direction of increased uniformity."[91]

If the court were to vary from the Guidelines with any frequency, it would be impossible to achieve this congressional objective. As explained in the earlier opinion in this case:

> The only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases. The only standard currently available is the Sentencing Guidelines. If each district judge follows his or her own views of "just punishment" and "adequate deterrence," the result will be a system in which prison terms will "depend on 'what the judge ate for breakfast' on the day of sentencing" and other irrelevant factors.[92]

---

84. S. Rep. 98–225, 1984 U.S.C.A.N. 3182, 3259 n. 288.

85. *See e.g.*, Robert Martinson, *New Findings, New Views: A Note of Caution Regarding Sentencing Reform*, 7 HOFSTRA L. REV. 243, 252 (1979).

86. Memo. from Harley G. Lappin to all Federal Judges, Re: Intensive Confinement Center Program (Jan. 14, 2005).

87. NAT'L INSTITUTE OF JUSTICE, CORRECTIONAL BOOT CAMPS: LESSONS FROM A DECADE OF RESEARCH (July 2003).

88. 18 U.S.C. § 3553(a)(6).

89. *.See* S. REP. 98–225, at 38; *see also Mistretta*, 488 U.S. at 363, 109 S.Ct. 647 (1989).

90. *Booker*, —— U.S. at ——, 125 S.Ct. at 760.

91. *Id*. at 761.

92. *Blakely v. Washington*, —— U.S. ——, ——, 124 S.Ct. 2531, 2533, 159 L.Ed.2d 403 (2004) (Breyer, J., dissenting). *See generally* Stephen Breyer, *The Federal Sentencing Guidelines and Key Compromises Upon Which They Rest*, 17 HOFSTRA L.REV. 1 (1988).

*Ranum* agrees that courts should "seriously consider the Guidelines." [93] Nonetheless, *Ranum* contends that courts "should not follow the old 'departure' methodology. The guidelines are not binding, and courts need not justify a sentence outside of them by citing factors that take the case outside the 'heartland.'" [94] *Ranum* goes on to conclude that "courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonably and carefully supported by reasons tied to the § 3553(a) factors." [95]

This court disagrees with *Ranum's* analysis for both procedural and substantive reasons. On a procedural level, it is critical for courts to follow the "old 'departure' methodology." *Booker* commands that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." [96] Departure provisions are, of course, part of "the Guidelines" that the court must take "into account" when imposing sentence. Unless the court calculates and then considers what the Guidelines advise as to a particular sentence in a particular case—that is, the initial Guideline sentence adjusted by any applicable departures—the court is not in a position to follow *Booker's* requirements. Today, the Second Circuit reached this conclusion, holding that district judges should decide whether to impose a sentence "within the

applicable Guidelines range *or within permissible departure authority*," as opposed to a non-Guidelines sentence. [97] As the Circuit explained, a "'departure' [is] not a sentence within the applicable Guidelines range, but it [is] nonetheless a 'Guidelines sentence,' *i.e.*, imposed pursuant to the departure provisions of the policy statements in the Guidelines, as well as the departure authority of subsection 3553(b)(1)." [98]

An illustration may serve to demonstrate this point. Consider a case in which a war veteran illegally possessed a machine gun as a trophy of war. It is essentially meaningless to learn that the Guideline range for this offense is 27–33 months [99] without also taking into account the fact that the Guidelines themselves specifically suggest a downward departure for "lesser harms" on such facts. [100] Moreover, the Guidelines themselves create a basis for determining the extent of any departure. As Judge Easterbrook explained in a leading pre-*Booker* opinion, "[I]t is possible to formulate approaches that link the extent of departure to the structure of the guidelines." [101] With regard to the extent of the departure for the war veteran, for example, the Guidelines create a downward adjustment for possessing an illegal firearm for "collection purposes." Although not directly applicable to the offense of possessing a machine gun, [102] this adjustment might provide a reasonable analogy for the extent of such a downward departure. [103] Whatever the ap-

---

93. *Ranum*, at 986, 2005 WL 161223, at *2.

94. *Id.*

95. *Id.*

96. *Booker*, —— U.S. at ——, 125 S.Ct. at 767.

97. *United States v. Crosby*, 397 F.3d 103, 113, 2005 WL 240916 at *7 (2nd Cir.2005) (emphasis added).

98. *Id.* at 111 n. 9, 2005 WL 240916 *14 n. 9.

99. U.S.S.G. § 2K2.1(a)(5) (prohibited weapon is a level–18 offense).

100. *See* U.S.S.G. § 5K2.11 (policy statement).

101. *United States v. Ferra*, 900 F.2d 1057, 1062 (7th Cir.1990).

102. *See* U.S.S.G. § 2K2.1(b)(2) (reduction not applicable for a restricted weapons offense).

103. U.S.S.G. § 2K2.1(b)(2).

propriate extent of the departure, however, until a court first determines how far the Guidelines themselves recommend as a departure, it is not in a position to "consider" the sentence that the Guidelines recommend.

Following the "old departure methodology" is also important for purposes of allowing both the Sentencing Commission and the Congress to monitor how the new system is working. It was for this very reason, among others, that the PROTECT Act required courts to specifically state in writing their reasons for issuing a sentence outside the Guidelines range.[104] The Sentencing Commission and Congress will understandably still be quite interested in learning how often sentences under the post-*Booker* regime fall within or without the Guidelines, and for what reason.[105] Unless a district court is clear about how it arrived at a sentence—"showing its work" as one respected commentator colorfully put it[106]—that data collection process will be aborted.

It is important for courts to follow the traditional departure methodology for substantive reasons as well. Because the departure methodology guides the exercise of discretion—both as to whether to depart and as to the extent of any departure—use of that standard methodology by courts around the country will help to minimize unwarranted sentencing disparity. On the other hand, if the *Ranum* approach is followed, different courts will surely give different weights to the broadly-worded factors listed in the Sentencing Reform Act. The result will almost inevitably be that defendants sentenced in the Eastern District of Wisconsin will serve different sentences for the same offense than similarly-situated defendants sentenced in the District of Utah. This would produce the "discordant symphony" of "excessive sentencing disparities" that the *Booker* majority stated would *not* be a consequence of its decision.[107]

*Ranum* concludes by asserting that "*Booker* is not [ ] an invitation to do business as usual."[108] In a narrow sense, this claim is true: *Booker* does require the court to make one new inquiry. After determining the Guidelines sentence (with any appropriate departure folded in), the court must still exercise its discretion to determine whether to vary from that sentence in light of the congressionally-prescribed purposes of sentencing. But it is important that courts do "business as usual" in one respect. In recent years, unwarranted sentencing disparity arising from judicial discretion has been dramatically reduced because of the Guidelines.[109] In a country committed to equal justice under the law—with a sentencing statute that mandates similar outcomes for similar crimes committed by similar offenders—this part of the court's business must continue. The only realistic way to insure this is to follow generally the Guidelines.

Accordingly, for all these reasons, the court reaffirms it earlier analysis that, as a

---

104. 18 U.S.C. § 3553(c)(2).

105. *See* Memorandum from Richardo H. Hinoja, Chair, U.S. Sentencing Comm'n, and Sim Lake, Chair, Criminal Law Committee of the Judicial Conference of the U.S., Regarding Documentation Required to be Sent to the Sentencing Comm'n (Jan. 21, 2005).

106. http://sentencing.typ epad.com/sentencing_law_and_policy/2005/01/always_remember.html.

107. *Booker*, —— U.S. at ——, 125 S.Ct. at 765.

108. *Ranum*, at 985, 2005 WL 161223, at *2.

109. 2004 Sentencing Commission Rep. ch. 5, at 140, *available at* http://www.ussc.gov/15_year/15year.htm (last visited January 31, 2005) ("the guidelines have succeeded at the job they were principally designed to do: reduce unwarranted disparity arising from differences among judges").

matter of discretion, it will give heavy weight to the Guidelines when determining a sentence. With respect to defendant Wilson, the court reaffirms its discretionary decision to impose a prison sentence of 188 months.

## CONCLUSION

One last point deserves brief discussion. Defendant Wilson has understandably challenged the severity of the Guidelines. Less understandable is the seemingly similar subtext in *Ranum* (and several other decisions tracking it) substantively disagreeing with the Guidelines severity. *Ranum* invites this reading when it reports that "[m]any judges have criticized the guidelines ... for their unnecessary harshness in many cases."[110] It is perhaps no surprise, then, that *Ranum* imposed a sentence significantly *lower* than that advised by the Guidelines. Perhaps what are couched as procedural or technical objections to Guidelines nuances are, in truth, simply a basic difference of opinion about how harshly crimes should be punished.

If this suspicion is true, then it raises troubling implications. As discussed at greater length in this court's earlier opinion,[111] the Guidelines have the backing of the public. According to sophisticated public opinion polling, "there is a fair amount of agreement between sentences prescribed in the guidelines and those desired by the members of the [public]."[112] This is hardly surprising. For nearly two decades, in an on-going dialogue with the Sentencing Commission, Congress has re-peatedly reaffirmed its view that the Guidelines are not overly severe. Indeed, as demonstrated by the PROTECT Act's recent significant restrictions on downward departures, Congress, if anything, takes the opposite view.

The decision about how harshly to punish crime in this country is a matter of legislative prerogative. As *Booker* plainly held: "The National Legislature is equipped to devise and install, long-term, the sentencing system, compatible with the Constitution, that Congress judges best for the federal system of justice."[113] However unhappy some may be with that allocation of power, that is the allocation our democratic system has created.

Yet paradoxically, *Booker* presents the judiciary with an opportunity to assume a greater role in sentencing decisions. For many years, judges have sought greater freedom from the Guidelines strictures.[114] Those judicial pleas were accompanied by assurances that judges would use any newly-granted freedom responsibly. Now, as a result of shifting majorities in the *Booker* decision, a less rigid system of advisory Guidelines has been put in place—at least temporarily. The judiciary thus has the chance to demonstrate to Congress that it can be trusted with greater freedom—that it will responsibly exercise any discretion not to thwart congressional objectives, but to implement them discriminatingly in particular cases.

Should the courts fail to carry out congressional will, there should be little doubt what will follow. Congress can easily implement its desired level of punitiveness in

---

110. *Ranum*, at 986 n. 1, 2005 WL 161223, at *2 n. 1.

111. *See Wilson*, 350 F.Supp.2d 910.

112. *Id.* at 2005 WL 78552 at *5 (citing Peter H. Rossi & Richard A. Berk, Just Punishments: Federal Guidelines and Public Views Compared (1997)).

113. *Booker*, —— U.S. at ——, 125 S.Ct. at 768.

114. *See, e.g.,* Kate Stith and José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998).

the criminal justice system, through such blunderbuss devices as mandatory minimum sentences. It is far better, then, for courts to exercise their discretion to insure that Congress' intention is implemented today through close adherence to the congressionally-approved Guidelines system, with only rare exceptions for unusual situations.

In this case, the court will achieve Congress' purposes by reaffirming its earlier discretionary decision to impose a prison sentence of 188 months—a sentence within the advisory Guidelines range. Judgment will enter accordingly.

SO ORDERED.