**UNITED STATES of America, Plaintiff,**

v.

**Jose DeJesus "Jesse" MERCADO–REYES, et al., Defendants.**

**No. A03–0171 CR (JKS).**

United States District Court, D. Alaska.

July 13, 2005.

*ORDER*

SEDWICK, District Judge.

The Court has before it for sentencing a number of the men and women indicted together in this case. The *Mercado–Reyes* case involves a drug conspiracy to bring heroin, methamphetamine, cocaine, and MDMA (ecstasy) from Moreno Valley in Southern California to Alaska for distribution. The first superceding indictment, which contained 139 counts, charged each of the twenty-six Defendants with participation in the overall conspiracy. The conspiracy was alleged to have lasted from July 2000 to November 2003. In addition individual Defendants were charged with various substantive counts, including possession of various controlled substances for sale, distributing controlled substances, and money laundering.

Three of the Defendants are fugitives. The remaining Defendants all entered guilty pleas in reliance upon plea agreements negotiated with the United States. The plea agreements expressly referenced the United States Sentencing Guidelines, which were in force at the time and which all parties assumed were mandatory and would govern sentencing. All of the cases were initially assigned to this Court. By agreement of the judges within this district, Senior Judge James M. Fitzgerald accepted assignment of some of the cases and took pleas and imposed sentence in the Court's absence out of district.

While sentencing was pending, the United States Supreme Court decided *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). *Blakely* addressed a presumptive sentencing system in place in the State of Washington. The *Blakely* Court held that the Washington system was unconstitutional under the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment,

because it established presumptive sentences and then permitted the trial court to increase those presumptive sentences based upon facts that the trial court found by a preponderance of the evidence; facts that had not previously been found by a jury. Prior to *Blakely*, the Supreme Court held in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that a sentencing scheme that permitted a trial judge to increase the maximum sentence permitted by law based on judge-made fact findings violated the Sixth Amendment's right to a jury trial. In *Blakely* the Court extended this rule beyond the maximum sentence set by law to apply to schemes in which a presumptive term could be increased based only on judge-made fact findings, even if the resulting sentence was less than the maximum permitted for the offense. While the *Blakely* Court was careful to provide that its holding did not address the United States Sentencing Commission's Guidelines, the dissent pointed out, presciently, that the reasoning of the majority was fatal to the federal guidelines, as well as the numerous guideline systems established in the states following the sentencing reform movement of the 1970s and 1980s.

*Blakely* sent a chill through many federal hearts because the circuit courts had up to that time unanimously held that *Apprendi* applied only to judge-made fact findings that increased the maximum sentence and not to judge-made findings that increased presumptive or guideline sentencing. Illustrative of the reasoning typical in these decisions is the Ninth Circuit's decision in *United States v. Ochoa*, 311 F.3d 1133, 1136 (2002). This view was reinforced when the United States Supreme Court decided *Harris v. United States*, 536 U.S. 545, 556, 560–69, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), which held that a jury need not find all the facts necessary to impose a mandatory minimum sentence. *Cf. Almendarez–Torres v. United States*, 523 U.S. 224, 239–47, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (holding that finding of prior convictions was a sentencing factor and not an element of offense submitted to a jury).

Faced with *Blakely*, the *Mercado–Reyes* Defendants divided into two groups. One group agreed to modify their plea agreements in light of the *Blakely* holding and stipulate with the Government to a specific sentence, waiving all *Blakely* concerns. *See generally* Fed.R.Crim.P. 11(c)(1)(C). The second group agreed with the Government to postpone sentencing until the United States Supreme Court decided two cases that addressed the applicability of *Blakely* to the Sentencing Guidelines.

That decision was announced on January 12, 2005. *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2004). As most judges expected, *Booker* held, in an opinion authored by Justice Stevens, that the Guidelines, as constituted, were unconstitutional because they permitted trial judges to enhance sentences authorized by the Guidelines based upon factual findings not submitted to a jury. Specifically, the Court held that the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. *Id.* at 756.

What came as a surprise was the remedy the Court fashioned to address the defects in the guideline system. This Court expected that the Supreme Court, following the reasoning of Justice Scalia in *Blakely*, would have held the Guidelines unconstitutional only to the extent that a guideline sentence was "increased" based upon fact findings not made by a jury. Under this view the Guidelines would remain mandatory, but henceforth those facts that controlled guideline adjustments and that increased a potential sentence

would be charged in the indictment and submitted to a jury, unless the parties addressed them in a plea agreement. Accordingly, the trial court would continue to have the authority to reduce a guideline sentence based upon judicial fact findings but could not increase it. This was the expected remedy announced by the Ninth Circuit in *United States v. Ameline*, 376 F.3d 967 (9th Cir.2004), *opinion amended and superseded on rehearing*, 400 F.3d 646, *rehearing en banc granted by* 401 F.3d 1007, *decision en banc*, 409 F.3d 1073 (2005).

Instead, a separate majority of the Supreme Court, in an opinion by Justice Breyer, excised two provisions from the statutes establishing the Guidelines. *Booker*, 125 S.Ct. at 764–66. The Court first excised the section that made the Guidelines mandatory. *See* 18 U.S.C. § 3553(b)(1). Henceforth, the Guidelines would be advisory. Trial courts would consult the Guidelines according to the factors found in 18 U.S.C. § 3553(a). But courts would no longer be bound by the Guidelines and would be required to evaluate each guideline sentence in light of the policies and goals set out in § 3553(a). The second section excised provided for de novo judicial review of trial court departures from the Guidelines by the courts of appeal. *See* 18 U.S.C. § 3742(e). Appellate courts would defer to trial court discretion and review ultimate sentences for reasonableness, even those deviating from what otherwise would be the guideline sentences. 125 S.Ct. at 765–66.

Careful consideration of the *Booker/Fanfan* decision and the jurisprudential context in which it was decided raises many questions regarding the continuing weight to be given the Guidelines. Various district courts throughout the country have given different answers to those questions. *Compare United States v. Wilson*, 350 F.Supp.2d 910, *denial of reconsideration on reh'g*, 355 F.Supp.2d 1269 (D.Utah 2005) (finding that guideline sentences are entitled to substantial weight and should be imposed unless substantial reasons justify variance), *and United States v. Wanning*, 354 F.Supp.2d 1056, 1059–63 (D.Neb. 2005) (finding that guideline sentences are "presumptively" correct), *with United States v. Jaber*, 362 F.Supp.2d 365, 370–76 (D.Mass.2005) (finding that guideline sentence must be determined and evaluated but entitled to no more weight than other purposes set out in § 3553), *and United States v. Ranum*, 353 F.Supp.2d 984, 986–87 (E.D.Wis.2005) (finding that guideline sentence was of only minimal importance). The courts of appeal have had insufficient time to offer their opinions.

This Court has had the benefit of the thoughtful discussion emanating from the published decisions of the district courts. The Court has been fortunate that a single prosecutor—Assistant United States Attorney Stephan Collins—has been assigned to all of the *Mercado–Reyes* cases, and he brings a wealth of knowledge regarding the Guidelines and their implementation. He has shared with the Court the position of the Attorney General. The Court has also been aided by the thoughtful comments of the lawyers representing the *Mercado–Reyes* Defendants. Virtually the entire criminal defense bar of Alaska is involved in this case. Most of the attorneys were appointed from the Panel formed to implement the Criminal Justice Act. The Federal Defender—Rich Curtner—has kept the CJA Panel informed of developments nationwide post-*Booker* and has shared with the Panel discussions from various conferences and continuing education seminars throughout the country. Recently the Court and counsel were privileged to attend a seminar sponsored by the federal bar at the joint conference of the state and federal bench and the bar at the Alaska State Bar Convention in Juneau. The participants were privileged to

have a stellar panel discussing *Booker/Fanfan* and *Blakely*. Included was the Honorable Ricardo H. Hinojosa, the current Chair of the Sentencing Guideline Commission. The Court has also considered the academic literature pouring forth. In addition, the Sentencing Commission's public hearings have generated thoughtful commentary. The Court has found the exchange of views at the hearings held on February 15, 2005, particularly helpful.

Of course, these issues are not new. Men and women have been debating the philosophical justifications of punishment since the days of Plato, Aristotle, and Seneca. A full spectrum of essays, both classic and modern, discussing the § 3553 purposes—retribution and reprobation and community protection; deterrence, incapacitation, and rehabilitation—have been collected for easy review. *See, e.g., A Reader on Punishment* (Antony Duff & David Garland eds., Oxford Univer. Press 1994); *Philosophical Perspectives on Punishment,* (Gertrude Ezorsky ed., State University of New York Press Albany 1972). The Nineteenth Century gave us the beginnings of social science research into crime, its causes, and prevention. In the Twentieth Century psychology took a great interest in crime and criminals and added to the library collections discussing crime and punishment. The entire literature devoted to crime and punishment is to a degree relevant to the task of weighing the philosophical bases for punishment and determining their priority in a given case.

The Court has carefully considered the Guidelines. If its discretion was absolute, it would follow a utilitarian sentencing philosophy emphasizing deterrence, both specific and general, incapacitation, and rehabilitation. It would only consider retribution as a limiting factor, assuring that a sentence chosen for incapacitation not last longer than the defendant's deserts would warrant. The Court does not, however, have absolute discretion. It is clear that the Guidelines balance retribution, measured along the vertical axis of the sentencing grid, against deterrence, incapacitation, and rehabilitation, measured along the horizontal grid. Congress has made it clear that the offense level—not the criminal history category—should drive drug sentences and that the offense level should primarily depend on drug quantity and quality and not on the relative culpability of the defendant. Virtually every policy decision the Commission has made is debatable. Nevertheless, having established guidelines will tend to reduce unwarranted disparity, even if it does not eliminate it. Courts should try and stick to the Guidelines, unless it appears clear that a particular defendant's role in the offense was so minor that his sentence must be adjusted to avoid an unfair comparison with people higher on the food chain.

In this case the kingpin was Defendant Jose DeJesus Mercado–Reyes. He organized the conspiracy, recruited its members, probably received significant income, and but for his bad luck in being arrested for immigration offenses in January 2003, would probably have continued in charge until the conspiracy was broken up by law enforcement a year later. While a purist could question the drug amounts attributed to Mercado–Reyes, as well as the many concessions that the Government granted him in order to induce a plea, the Court has considered the Government's arguments and finds them consistent with the spirit of the Guidelines, if not their letter.

Having sentenced Mercado–Reyes, pursuant to his agreement with the Government, to 188 months,[1] the Court could not

---

1. Mercado–Reyes did not cooperate with the Government. No downward departure was

in good conscience sentence his chief lieutenants to more time. Without exception, their criminal histories were less than his. He recruited them. The Court therefore deviated from a strict guideline approach and scaled their sentences to his in order to reflect their relative culpability. All of the sentences imposed on Mercado–Reyes's lieutenants exceed ten years and thus are sufficient for purposes of deterrence,[2] incapacitation, and provide a setting for rehabilitation. Lesser sentences were imposed on a number of facilitators who did not profit to any significant extent from the enterprise. Any felony sentence that exceeds one year is sufficient for reprobation because it serves to condemn the conduct and inform the public that the offenses are not trivial. The Court recognizes that Congress stresses retribution in drug sentencing and that the guideline sentences for some of these men and women would be significantly higher than what the Court has imposed. The Court originally intended to write a detailed written decision tracing the history of sentencing from Beccaria and Bentham through Kant to the present in the hope of demonstrating how these sentences reconcile the sentencing purposes set out in § 3553 with the Guidelines. In the end, the Court does not believe that such analysis would be helpful. The Court will rely on this brief explanation, supplemented by its oral remarks during the sentencing of each Defendant, to explain how it exercised its discretion.

**IT IS SO ORDERED.**

---

requested. The Government made other concessions. Despite Mercado–Reyes's extensive criminal career, including past drug felonies, no 21 U.S.C. § 851 information was filed. Mercado–Reyes was not given an enhancement for his role in the offense, and the Government was generous in its stipulation with him regarding the quality and quantity of drugs. On the other hand, most of the Government's evidence against the conspirators was gathered after Mercado–Reyes was in jail awaiting trial on immigration charges. Mercado–Reyes, as the kingpin, had insulated himself to a greater extent than did some of his lesser agents, who were caught with the goods.

**2.** A sophisticated deterrence analysis would balance the incentives (benefits) associated with the crime against its detriments. Here, the incentives are financial and in the case of some of the minor players and at least one of the major players, payment in kind in drugs for their private consumption. A sentence of more than ten years should be sufficient to tip the scales if these people are deterrable. With the exception of Mercado–Reyes himself, and perhaps Defendant Abel Chavez, none of the Defendants have such a bad history that their sentences should be primarily for incapacitation.